Max Goldman, Defendant in Error, v. White & Davis Investment Co., Plaintiff in Error.—38 S. W. (2d) 62.

Kansas City Court of Appeals. January 26, 1931.

*J. Francis O'Sullivan* and *O. H. Stevens* for defendant in error.

*Maurice J. O'Sullivan* of counsel.

*Ringolsky, Boatright & Jacobs* for plaintiff in error.

ARNOLD, J.—This action was brought to recover damages to plaintiff's property, alleged to have been due to negligence of defendant.

The suit originated in the court of a justice of the peace of Kaw Township, Jackson County, Missouri, by filing therein an instrument entitled "Statement for Damages," which recited the defendant is a corporation organized and existing under the laws of Missouri;

that at the times mentioned it was the owner or lessee in possession and in charge of the Lee Building at Tenth and Main Streets in Kansas City, Missouri; that plaintiff, at the times mentioned was a tenant of said building, under a lease, occupying offices on the seventh floor thereof, and in particular, roof 736; that under the terms of the rental contract between the parties, defendant was to furnish janitor service and heat, and was to have free access to the office of plaintiff for such purposes; that on or about January 15, 1925, during the night, after said office was closed and plaintiff and his employees had all left the building and said offices were under the control of defendant, and due to the negligence and carelessness of defendant, steam and hot water, a part of the heating apparatus in said building, was caused, allowed and permitted to escape in said room numbered 736, causing damage to plaintiff as set out in an itemized list incorporated in said statement, amounting to $450 in total, and judgment was asked in that amount.

Plaintiff had judgment in the justice court for $450, and defendant appealed to the circuit court where the cause was tried to a jury, resulting in a verdict and judgment for plaintiff for the same amount. A motion for new trial was overruled and defendant appealed. The appeal was later dismissed and the case is here for review on a writ of error. There appears to be no dispute as to the material facts in the case and the contest is as to the application of the law to the facts.

The facts of record are that plaintiff is a physician and surgeon; that for some years prior to the occurrence giving rise to this suit, he had occupied, under lease, the quarters here involved, consisting of several rooms, one of which is described as a large room. Sometime during the autumn of 1924, the tenant desired to have said large room partitioned to make two rooms. The lessor gave permission for the change, providing it was done at the expense of the lessee and by someone then in defendant's employ, and the change was accordingly made. The testimony shows that during the course of the work it was determined by defendant's employee making the alterations that it was necessary or advisable to remove a large radiator then in said room. The said alterations were made at a time when no heat was being used in the building, and on notice from the employee doing the work, the engineer of the building removed said radiator. After the partition was completed, defendant's said engineer placed a smaller radiator in each of the two newly made rooms. After heat in the rooms became necessary, plaintiff decided that as there was a large "riser pipe" in the room in question, a radiator was not necessary. One of the rooms made by the partition was used by plaintiff as a consultation room. On repeated requests of plaintiff, defendant was asked, through its engineer and secretary and treasurer, to remove the small radiator from plaintiff's consultation room.

About two months prior to the occurrence giving rise to this suit, defendant's engineer removed said radiator, in accordance with plaintiff's prior requests, leaving the valve regulating the control upon the end of the pipe; and a short bit of pipe extending out of the end of the valve was left with no cap or plug thereon, so that if the valve were either turned or jarred, the steam, or condensed water, would issue therefrom. The testimony shows that on two or three occasions prior to the happening complained of, plaintiff or his secretary noticed a small amount of steam escaping from the open end of the pipe, or that drops of water fell therefrom upon the carpet, as a result of condensation of steam emitted as stated. Upon each of these occasions plaintiff's secretary tightened the valve, stopped the leak and immediately notified defendant about it; and on three or four occasions prior to January 9 or 10, 1925, when the damage occurred, defendant, through its officers and engineer, promised to cap the open end of the pipe. The testimony shows the damage occurred on January 9 or 10, 1925, which is some five days prior to the date charged in the statement of damages filed in the justice court; but as there is no point made of this, we need not consider it.

On January 9 or 10, plaintiff and his associates in the office, except his secretary, left the office by six o'clock, as they testified, and no steam was then escaping from the offending pipe. Plaintiff's secretary, Miss Hobart, remained at the office until ten o'clock. She testified there had been no steam escaping that day. On this point Mr. White, president of defendant corporation, testified the steam in the building, except that supplying the drug store on the ground floor which was controlled by a separate valve, was turned completely off at six P. M.

The testimony shows that during the night defendant's janitors cleaned the rooms in the building at a time when there was no steam turned on. One of these, known as the vacuum man, used a vacuum sweeper in the cleaning process and another dusted the rooms. It is shown the open-ended pipe was beside the north wall of the consultation room and plaintiff's desk was so placed that one end of it almost abutted the valve and pipe mentioned, so that the valve was protected from the sight of a person in the room and also from being accidentally struck. The vacuum sweeper used was so constructed that it could be shoved around and under the sanitary desk and near the valve in question. The testimony shows the desk had been dusted by defendant's janitor during the night. The vacuum man, testifying for defendant, stated he did not know whether he was working at that time or not, and did not know whether he was in plaintiff's office on the night in question. This witness testified that the vacuum sweeper was arranged with a bend on the end thereof so that he could shove it under the desk in question for cleaning

purposes, and that the bend was such that the height of the cleaner from the floor could be regulated from the handle thereof.

Plaintiff's evidence shows that on the opening of the office about nine o'clock, following the night in question, the consultation room was filled with steam, some of which had found its way into the reception room. A dentist who occupied an adjoining office went into the consultation room and turned off the valve which he found open. Defendant was notified and its agent immediately went to the room in question. The testimony shows water was dripping from the ceiling; that all the furniture and furnishings were soaked and plaintiff's dyelectron machine, used to treat patients, was short-circuited and rendered dangerous to use and had to be rebuilt; and the furniture turned white in color. The testimony shows that plaintiff's expense in repairing and replacing the articles damaged and destroyed was $450.

Plaintiff introduced as an expert witness a heating engineer of large experience who testified that the pipe could easily and successfully have been capped, and this should have been done; that the usual way of taking off a radiator from the steam line is also to remove the valve and place an iron cap on the end of the pipe, and that it was not customary to leave the valve on the end of the pipe, because the least jar or vibration on the pipe was liable to open the valve.

John Lawson, testifying for defendant, stated he was employed as vacuum man in the Lee building on the night in question, and it was his duty, as such employee, to clean the carpets in all the offices in the building; that he would start at six and be through at three o'clock in the morning; that the pipes leading to the radiators are at least three inches above the floor; that there is a valve between the pipe and the radiator which is turned off to shut off the steam; that no part of the vacuum sweeper could strike the valve in such a way as to turn on the steam.

The lease, under the terms of which plaintiff was occupying the rooms in question, was introduced in evidence and is a part of the record.

There is but one assignment of error and this is presented under three sub-headings. The charge is that the court erred in refusing defendant's request for a peremptory instruction in the nature of a demurrer at the close of plaintiff's case and again at the close of all the evidence, because (a) the provisions of the lease expressly relieve defendant from liability for any damage caused in the manner alleged and proved by plaintiff; (b) the landlord, under a lease providing he shall make repairs, cannot be held liable in tort for damage to plaintiff's person or property for negligent failure to repair, such damage being too remote; and (c) under plaintiff's case, he was guilty of contributory negligence as a matter of law.

Under subdivision (a) of this charge, it is urged a landlord may legally contract against liability for damage caused to the person or property of a tenant by the negligence of the landlord. From this statement of what defendant conceives to be the law, it is argued that if a landlord can contract against and limit his liability for damage caused by his negligence, he can contract against and limit his liability for damage caused by his breach of contract, whether such damage is the result of a negligent performance of a duty under the contract, or a complete failure to perform the duty. This argument is based upon the provisions of sections 7 and 8 of the lease in evidence, as follows:

"Seventh. The lessor shall not be liable for any damage to property, in or upon said premises or in said building, from fire, water, steam, rain or snow, gas or electricity, which may get into, issue or flow from any part of said building, or from the pipes or plumbing work in or about the building, and shall in nowise be responsible for any loss of property, however occurring, nor for unavoidable delay in furnishing heat, water or light to the premises, or in operating elevators.

"Eighth. The lessee shall give to the lessor or to his agent prompt written notice of any accident to or any defects in the water pipes, gas pipes, electric light fixtures, or heating apparatus which may come to his notice upon or in connection with said premises, and such defects shall be remedied by the lessor with due diligence."

In support of its position in this respect, defendant points out that section 7 of the written lease provides the landlord is not liable "for any damage" to property on the leased premises caused by water or steam which may issue or flow from pipes or plumbing in or about the building; that this restriction against liability "for any damage" was not limited to damage caused by negligent failure to repair, under the contract, but included any damage caused by "steam . . . which may issue or flow from the pipes or plumbing work in or about the building;" that the cause of the issuance or flow of steam from pipes or plumbing is immaterial; and if, in this case, the damage resulted from steam issuing from pipes or plumbing in the building, under the terms of the lease, defendant is not liable therefor. It is also urged the lease provides that if lessee gave prompt written notice to the landlord of defects in the heating apparatus, such defects would have been remedied by lessor with due diligence. It is argued that, in the absence of a covenant to repair, the landlord is under no obligation whatever to repair the leased premises; that his liability in that respect is limited to such repairs as may be expressly assumed by the terms of the lease contract; that he may agree to repair, but that he may also limit his liability for failure to repair.

It is urged that such provision against liability is not illegal or contrary to public policy any more than limitation against liability for negligence; that the effect of all the provisions in the lease here involved is that while the landlord agreed to remedy the defects in the heating apparatus, he was not liable for "any damage" caused by steam issuing or flowing from the pipes or plumbing, whether caused by failure to remedy a defect, or negligence; that his liability for failure to repair is limited to the cost of making the repair, and not to consequential damage to property caused by failure to make repairs or remedy defects.

We think we have stated fairly defendant's position in respect to the construction to be placed on the provisions of the lease contract in issue. It is plaintiff's position in this respect that the provisions of the lease in question do not relieve the landlord from liability for its active and affirmative negligence. It is pointed out that defendant was notified on three or four occasions of the uncapped and unplugged pipe, left in that condition by defendant's engineer, before any damage resulted; that the record shows the steam was not leaking during the day preceding the loss and damage complained of, nor when the office was left by plaintiff and his employees; that the record shows the vacuum man and the janitor who did the dusting were the only ones in the suite between the time of closing by plaintiff's secretary and the time the damage was discovered; that the heat, or steam, was admittedly turned off by defendant by use of a valve in the basement, between five and six o'clock in the evening preceding the damage, and was again turned on by its engineer about seven o'clock of the morning in question.

In this situation, it is the law of Missouri that a landlord who retains a portion of the leased premises under his control is liable in damages for a loss therefrom sustained by the lessee through negligence of the lessor; that it was the duty of defendant to furnish heat, under paragraph 5 of the lease, which is as follows:

"Fifth. The lessor shall, at his own expense, keep the demised premises warmed with steam-heat during such periods as may be necessary, from the first day of October in each year to the 15th day of May following, from 8 A. M. to 6 P. M., Sundays and holidays excepted, and shall cause the said premises to be cleaned and generally cared for by the janitor of the said building. It shall, as far as is practicable with reasonable diligence, operate elevators for the accommodation of its tenants and persons having business with them, and light and heat the hallways of the said building as reasonable comfort may require on all days of the week from 8 A. M. to 6 P. M., Sundays and legal holidays excepted."

That this clause carries with it the necessity on the part of defendant to keep the heating plant, including pipes and radiators,

in good repair, is obvious, and in the event of lessor's failure in this respect, liability for resulting damage attaches.

It is further pointed out that the lease provides that defendant was to remedy with due diligence any defect in the heating plant or pipes, as provided in paragraph 8 of the lease; that this was a specific undertaking by defendant to keep the pipes and heating apparatus, including radiators, in good condition and repair; that defendant, having taken the radiator out and caused the condition which the jury found to be the proximate cause of the damage, it is liable, under the theory that even though, as defendant claims, it was under no obligation to make the changes, if it undertakes to make them and is negligent in so doing, it is liable in damages for its own negligence.

It is also plaintiff's position that a stipulation in a contract exempting one from liability for negligence is void as against public policy. Thus we have before us the contrasting theories of the litigants, as presented in their briefs, and in weighing these, it is our first duty to determine whether the trial court erred in refusing defendant's proffered instructions in the nature of demurrers at the close of plaintiff's case and at the close of all the evidence.

In the consideration of this point, it is proper to determine whether a lessor, by stipulation in the lease, may relieve himself of liability for positive negligence in the performance of duties assumed in the lease. It is true that parties may contract regarding exemption from liability; but the question remains, does paragraph 7 of the lease in issue relieve defendant from liability for the damage to plaintiff, as shown by the evidence in this case? We think not. Paragraph three of the lease provides lessee "shall not make any alterations, or improvements in said premises . . . without the written consent of lessor." Paragraph eight provides the lessee shall give lessor written notice of any defects in water pipes, gas pipes, electric light fixtures, or heating apparatus, and such defects shall be remedied by lessor with due diligence. Thus it is seen defendant reserved the right to repair any defects in the heating apparatus. The testimony shows that the repairs in the suite of offices in question were requested by plaintiff of defendant and the same were undertaken by defendant, including the removal of the radiator. Under the terms of the lease defendant reserved the right to do this. The job was not complete, as found by the jury, because the open pipe was not closed. In this state of the evidence the jury was warranted in finding defendant was negligent.

It is the law that in construing a contract, the entire instrument must be considered, and in this case paragraphs seven and eight of the lease must be considered and construed together. Paragraph eight provides for "written notice of any defects" in the heating apparatus. The word "defects" might require a definition to de-

termine whether the condition of the steam pipe was, in fact, a defect within the meaning of the lease. Webster's International Dictionary defines the word: (1) "Want or absence of something necessary for completeness or perfection; deficiency; (2) failing; fault; imperfection, whether physical or moral; blemish. Synonyms: deficiency, imperfection, fault." In the light of this definition, we may not hold that the condition of the uncapped pipe, or valve may be considered a defect within the meaning of paragraph eight of the lease. The condition of the pipe, as left by defendant's engineer may not be held to be such a defect as is meant by paragraph eight; plaintiff charges it to be a condition due to defendant's negligence, and not a defect in the heating apparatus.

Defendant contends the provisions of the lease exempt defendant from any damage caused by the flow of water or steam issuing from the pipes, and cites Weirick v. Realty Co., 228 N. W. (Minn.), 175. The facts in that case are similar to the one at bar, though not quite the same. There, the plaintiff, a dentist, rented rooms in an office building for use as his office. He requested the defendant to redecorate the rooms and defendant employed a painter to do the work. The painter painted the walls and on a day when plaintiff's assistant was absent, painted the floor of the assistant's room. The paint used made the floor slippery and while the painter was absent from the room, the plaintiff, who did not know the floor had been painted, stepped into the room, slipped and fell, sustaining injuries for which the jury gave him a verdict. The plaintiff's lease contained the following provision:

"The lessor shall not be liable . . . for any accidental damage to person or property in or about said premises or building resulting from operating elevators or electric wiring or water, rain or snow which may come into or issue or flow from any part of said premises or building, or from the pipes, plumbing, wiring, gas or sprinklers thereof, or that may be caused by the lessor's employees, or any other cause whatever, and the lessee hereby covenants and agrees to make no claim for any such loss or damage at any time."

The Supreme Court of Minnesota reversed the judgment, saying, in part:

"A lease is a matter of private contract between the lessor and lessee with which the general public is not concerned. And if the parties see fit to contract that the lessor shall not be liable for damages resulting from his negligence or the negligence of his employees, the law permits them to do so; and the courts must give effect to and enforce such contracts."

Defendant cites another Minnesota case, namely, Insurance Co. v. Foley Bros., 169 N. W. 793. These cases seem to hold with defendant, but the cases cited in the opinions to sustain them are based upon the theory that the contract is one of indemnity. These cases

hold that the public policy rule requires that the right of contract shall be held inviolate in all ordinary cases, and is to be denied only when the particular contract violates some principle which is even more important to the general public. Our attention has not been called to any cases in Missouri thus limiting the meaning of the term "public policy." The courts of the various states have not uniformly held with Minnesota; in fact none has so held with the possible exception of North Carolina. [So. R. R. Co. v. Stearns Bros., 28 Fed. (2d) 560 (Fourth circuit).] Other states, notably Massachusetts, New York, Illinois, Rhode Island, District of Columbia and Missouri, hold a contrary view. Referring to the Missouri cases, it was held in Potts v. Ry. Co., 17 Mo. App. 394:

"    . . .   it is considered in this State, and most others in America, that a stipulation of exemptions for negligence is void and against public policy."

In Ex parte Mobile L. & R. Co., 101 So. 177, it is said:

"It is a well known and just rule that where parties by contract enter into a relation carrying a legal duty, while one may limit the scope of his duties, he cannot stipulate for protection against negligence in the performance of the duties he does assume."

In 6 R. C. L. 727, the general rule is stated thus:

"Undoubtedly contracts exempting persons from liability for negligence induce a want of care, for the highest incentive to the exercise of due care rests in a consciousness that a failure in this respect will fix liability to make full compensation for any injury resulting from the cause. [So. Express Co. v. Owens, 146 Ala. 412, 41 So. 752, 119 A. S. R. 41; 9 Ann. Cas. 1143, 8 L. R. A. (N. S.) 369.] It has therefore been declared to be good doctrine that no person may contract against his own negligence. [Shohoney v. Quincy R. Co., 231 Mo. 131, 132 S. W. 1059, Ann. Cas. 1912A 1143.]"

And in 36 C. J. 236, the rule is stated:

"    . . .   it has been held that, where the lease exempted the landlord for any damage, caused by the positive wrongful act of the lessor or his employee, active negligence was such a positive wrongful act within the exception of the stipulation that the landlord would be liable. Furthermore, it has been held that a covenant exempting a lessor from any loss arising from 'fire, water, or otherwise, or in any other way or manner,' does not preclude a tenant from recovery for the negligence of the landlord or his servants."

Defendant relies upon the ruling of the Supreme Court in Gralnick v. Magid, 238 S. W. 132. In that case the damage was due to a rain storm, and it was not claimed, as here, that it was due to active negligence of the landlord. The facts in that case and the ruling of the court do not apply here. We have examined the various cases cited by defendant and find they are not decisive of the points here raised.

In the case of Insurance Co. v. Railroad, 70 Fed. 201, 206, it is said by SANBORN, J.:

"It goes without saying that the railroad company could have legally employed an insurance company to indemnify it against loss by fire occasioned by the negligence of its servants. If there were goods of its customers burned in the warehouse, the lessees had, in effect, insured the railroad company against damages for their loss, and the insurance companies had insured the lessees. No reason is perceived why these contracts are not valid."

And l. c. 207:

"The contract leaves it (the railroad company) under the same duties and liabilities to which it was subject before it was made. It is bound to the same diligence, fidelity, and care, after a lease containing such a contract is executed that it would have been required to exercise if no such agreement had been made. [Express Co. v. Caldwell, 21 Wall. 264, 267, 268.] The only effect of the contract is to prevent the assumption by the railroad company of a new duty, which it was entirely free to assume or to refuse to assume."

While the authorities are not in accord on this question it is clear the great weight of authority is on the side of plaintiff. [13 L. R. A. 844.] It is urged that if the lease contain a provision obligating the landlord to make repairs, the only action which will lie against him for failure to make them is one for damages for breach of contract; that in such case the damage to person or property of the tenant is deemed too remote to be recoverable. From what has already been said we need not discuss this point further. We rule the same against defendant.

Defendant attempts to draw a distinction between corporations serving the public and private corporations and individuals, in the application of the "public policy" rule. But from the rule announced in the cases cited, supra, we hold this contention to be without merit.

Finally it is insisted plaintiff was guilty of contributory negligence as a matter of law in not taking necessary steps to have the valve tightened permanently, or the pipe capped; that it was negligence to leave the pipe in the condition it was; and that it was contributory negligence for plaintiff not to have taken steps to protect his property after he knew the facts, and the consequences thereof. [Citing Febel v. Realty Co., 227 S. W. 858; Degnan v. Doty, 246 S. W. 922 (Mo. Sup.).] In the Febel case, the court said:

"The mere fact alone, however, that the tenant is aware of the defective condition of the portion of the premises which it is the duty of the landlord to repair does not, as a matter of law, make it contributory negligence to continue to use the same if it reasonably appears that he might safely do so with the exercise of care, so that,

if a tenant is injured under such circumstances, the question of contributory negligence should be submitted to the jury.''

For reasons above stated, we hold the trial court did not err in refusing defendant's instructions in the nature of demurrers.

The judgment is affirmed. *Bland, J.,* concurs in the result. *Trimble, P. J.,* absent.