[Civ. No. 14861. First Dist., Div. One. Mar. 28, 1952.]

FRANCIS BUTT, Plaintiff and Appellant, v. PETER BERTOLA et al., Defendants and Appellants.

Horace T. Beverly and Bertrand F. Lurie for Plaintiff and Appellant.

Pierre J. Ibos and James A. Himmel for Defendants and Appellants.

WOOD (Fred B.), J.—Plaintiff leased from defendants a ground floor store for a sandwich, grocery, or soft drink business, for the term of three years, commencing May 1, 1947.

Claiming that he had been evicted during the term of the lease, plaintiff brought this action for damages allegedly caused thereby. The trial court found: (1) that plaintiff was evicted and compelled to and did abandon and give up possession of the store on August 31, 1949; (2) that plaintiff thereby

suffered loss of profits in the amount of $2,666.66; (3) that defendants still retain an advance deposit of $600 given by plaintiff to defendants upon execution of the lease; (4) that plaintiff's stock in trade was damaged in the amount of $170.33; and (5) that plaintiff's equipment and other personal property was damaged in an amount ranging between $1,600 and $1,900.

The court rendered judgment in favor of plaintiff in respect to the items of damage mentioned in clauses (2) and (3) above, but, because of an exculpatory clause in the lease, rendered judgment in favor of defendants as to the items mentioned in clauses (4) and (5) above. Defendants appealed from the judgment and the whole thereof and from an order denying their motion for new trial. Plaintiff appealed from that portion of the judgment which did not award him damages to his stock in trade, equipment, and other personal property.

 (1·) *As to the eviction,* the trial court found that defendants had control of the sewerage system and plumbing used in the building except as to the store leased by plaintiff; that within a few weeks after plaintiff took possession, the sewerage system and plumbing, other than that connected with plaintiff's store, developed leaks and became in bad repair, causing sewerage water to leak from the ceiling into the store and on the personal property of plaintiff, which leak continued intermittently and at irregular intervals throughout plaintiff's occupancy; that upon plaintiff's first discovery of the leak, he notified defendant Peter Bertola and showed him the leak on numerous other occasions, at all of which times said defendant knew the leak was caused by a pipe connected with the sewerage and plumbing system of the flat above plaintiff's store becoming in a state of disrepair; despite such knowledge, defendants would either disregard the notice and refuse to make any repair, or would take improper and inadequate measures to fix the leak; that on August 18, 1949, as a direct result of defendants' failure, refusal and neglect to adequately and properly repair the leak, a great quantity of foul sewerage water escaped from such system located directly above the store and ran into and flooded the store and caused a quantity of plaster and rubble to fall from the ceiling and walls upon plaintiff's equipment and other personal property; and as a result thereof plaintiff's quiet enjoyment of the demised premises as a tenant of defendants was interfered with in that the demised premises were rendered wholly unfit

for the use and purpose for which they were leased to plaintiff, and plaintiff was evicted and compelled to and did abandon and give up possession of the store as of August 31, 1949.

The evidence supports this finding. Plaintiff testified that he leased one of several ground floor stores, that the second floor consisted of dwelling units. A few days after he took possession a customer called attention to the fact that he was getting wet by stinking water, which was coming from the ceiling. Plaintiff told Peter Bertola (hereinafter called the defendant) who said "I fix." The leak was not fixed, but for about six months it stopped during the day. In the mornings plaintiff would find water that had leaked through during the night. When new tenants moved into the flat above, the leak started again. The leak occurred whenever the tenants above the store used certain wash trays. The leak was small intermittent drops. The leak was called to defendant's attention many times by plaintiff. Each time plaintiff called defendant's attention to the leak, defendant would take a rag, go upstairs and stuff the rag in the pipe. Defendant would also attempt to open up the pipe with a plumber's snake so the water would flow through the pipe. During the middle of May, 1947, when plaintiff saw that defendant was not going to do anything about the leak, plaintiff removed four stools, erected a partition, and kept a bucket behind the partition to catch the water.

Plaintiff testified the leak was not from any plumbing connected with his store, the demised premises.

August 5, 1949, plaintiff closed his shop and went on a vacation. He returned on August 15th and entered the store to see about the mail. At that time he did not notice anything unusual. He again returned August 18th. This time there was water on the floor up past the middle of the room. The equipment was slimy and covered with residue. Water was running out the back door. The place had a foul odor. Merchandise in the basement was soaked.

All of this testimony of plaintiff was corroborated by his assistant, John Cole, who further testified that on that day when plaintiff called him in (August 18, 1949), there was water everywhere, running out the back door. Filth was coming down across the refrigerator. Paint on the refrigerator had been corroded and eaten away. The service counter was practically destroyed, so water marked that the metal was of no further value. The wooden backing on the service counter

was warped out of shape. The pie racks were warped out of shape. Many of the chairs in the dining room were damaged, and were all sitting in water. The paint on the side walls in many places was hanging out in big water blisters. There was a very foul and offensive odor. The basement was much the same as the store proper. The ceiling of a storeroom in the basement had been loosened by water and a portion had come down. All the merchandise in the basement was water soaked. The books of record which plaintiff kept were water logged.

Emily Shaw, who lived in one of the upper flats and washed clothes in or at the rear of the flat above this store from February, 1949, until the time of trial (March, 1950), testified that she used the washing machine in the kitchen, and wash trays on a porch, situated directly over the rear of the store and at one time about three weeks after she had moved in and was washing clothes, defendant walked into the kitchen, pulled the plug out of the socket of her washing machine and told her she could not wash, saying "it leaks down in restaurant." He also told her she could not use the laundry trays because the drainage was plugged. It was plugged with rags and she cleaned them out. The plugs were in the drain where the water went down. She did that so she could wash her clothes. She heard plaintiff ask defendant what he was to do about the leak and defendant said he did not want to be bothered with it, that he was tired of hearing about it. She heard such a conversation four or five times. She said her laundry trays never leaked over. Defendant told her it was the pipe that leaked, that he did not want her washing for that reason because when she pulled the water from the laundry trays, it would go through that pipe. The pipe leaked and defendant said the pipe was broken and that when she was washing there, all the water was going down into the restaurant; he did not want her washing her stairs, or to get water on the porch, because he said it would go down on the stairs and into the restaurant there. She further testified that between 10 and 11 o'clock on the morning of August 18, 1949, the trap on her porch was backed up with dirty water, that defendant was in the yard, so she called him. He came up, looked at it and she said "what are you going to do about this?" and he said: "Nothing. Nothing. You get the plumber. You did it." She replied that she did not do it, and defendant said, "I'm not going to do nothing about it." To which she replied if he did not do something, she would call the public health, and

then he said he would get a plumber's snake and he did get a long plumber's snake and put it in the trap, which had backed mucky water up into the laundry trays. He put the snake through the trap, got the dirty water all cleared out. It had gone down, and then he took water from the tray and kept filling water into the trap for about an hour and a half.

A city health inspector testified that he and another inspector visited the place August 22, 1949, and found the merchandise damaged by water. The ceilings were soaked. The kitchen was in a state of disrepair, evidently from dripping water. The floor, walls, and ceilings were damaged by water. There was a foul odor. The other inspector quarantined the damaged merchandise and the room where the cooking was done. The witness instructed plaintiff he could not operate as a restaurant under those conditions, and not to reopen the premises until fixed up to the satisfaction of the city health department. The place was not in a fit and proper condition to be operated as a restaurant.

Defendants contend that nothing which happened prior to August 18, 1949, can be considered because prior to that time the damage was slight and plaintiff continued in business at a profit, and that shortly after the 18th defendant did repair the plumbing and replace the plaster. The trial court did not take such a view of the situation. ■ The fact that plaintiff, prior to August 18, 1949, adjusted himself to a difficult situation by removing several stools near the leak and kept a pail under the leak, to minimize the damage, did not absolve defendants from the consequences of their acts. We would not undertake to say, as a matter of law, that when the flooding occurred on the 18th of August plaintiff was under an obligation not to treat that as a culmination of acts which constituted an eviction. In this connection, it is significant to note that some time prior to the 18th of August, 1949, plaintiff offered to repair defendant's plumbing at his own expense but defendant refused to permit him to do so.

Defendants question a finding that after the incident of August 18, 1949, plaintiff's license to operate a restaurant was revoked. They argue, in effect, that the privilege to operate was merely suspended until the restoration of sanitary conditions suitable for operation. That is a distinction without a difference, insofar as it bears upon the finding that plaintiff was evicted.

Defendants place some reliance upon a clause of the lease

by which plaintiff waived the right to make repairs at the expense of the landlord as provided in section 1942 of the Civil Code, and agreed at his own expense to make "all repairs necessary to the herein demised premises." That, obviously, had reference to repairs on or in the demised premises, not to needed repairs on or in portions of the building retained under defendants' control.

■ (2) *The finding that plaintiff sustained a loss of profits in the amount of $2,666.66* is sustained by plaintiff's testimony- that his average net profits were $4,000 a year, testimony given without objection. At that rate, deprived of the use of the property during the last eight months of the lease period, he lost precisely the amount found.

Defendants erroneously claim that a certain clause of the lease (later discussed herein) exculpated them from liability for loss of profits. That clause, at most, exculpated them from liability for "damages to any goods, property or effects . . . caused by gas, water, or other fluid." The loss of profits caused by the eviction is not in the nature of "damages to property" caused by gas, water or other fluid.

■ (3) *As to the $600 refund,* the court found that, as security for faithful performance of the lease upon his part, plaintiff deposited $600 with defendants on the express understanding and agreement that if he be not in default said sum was to apply on the monthly rental due for the last six months of the term, and that the defendants still retained the advance deposit of $600.

These findings call for interpretation of the following provisions of the lease: "It is distinctly agreed and understood that in the event of the faithful performance by the Lessee of each and every, all and singular, the terms, covenants and conditions of this lease, and the prompt and faithful payment of all of the rent and all other sums herein provided to be paid, at the times and in the manner herein specified, and ONLY in this event, the said Lessor will allow to the Lessee, free rent for the last six (6) months of this lease.

"It is distincely [sic] agreed and understood that this allowance and rebate shall only be made by the Lessor in the event of the faithful performance by the Lessee of all and singular, each and every, of the terms, covenants and conditions hereof which is the sole consideration therefor, and that in the event of a termination of this lease at any time before the expiration of the term herein provided, for any cause or reason whatsoever, said Lessee shall have no claim against

the Lessor for any allowance or rebate on account of the rent herein provided to be paid or on account of the sum of SIX HUNDRED ($600.00) dollars, paid to the Lessor by the Lessee, which is the consideration for the making of this lease and said Lessee agrees that the same is so paid as a consideration therefor, and for the purpose of obtaining this lease, and is an absolute payment to the Lessor for that purpose.''

These provisions must, of course, be read in the light of another clause of the lease, wherein plaintiff agreed to pay a total rent of $3,600, monthly in advance, in equal monthly payments of $100.

Let us first read the quoted words literally, as defendants would have us do. By those words, defendants say they will allow free rent for the last six months if plaintiff fully performs his obligations under the lease. (Plaintiff has fully performed; defendants have not. Plaintiff would seem to have six months ''free rent'' coming to him, of which he was deprived by the eviction.) The parties went on and said ''this allowance and rebate'' shall be made only if plaintiff fully performs his obligations under the lease, such performance being the sole consideration for the allowance and rebate. (That does not add anything. It is just another way of saying it.) Then they said: In the event of a termination of this lease at any time before the expiration of the term ''for any cause or reason whatsoever'' plaintiff will have no claim for any ''allowance or rebate'' on account of rent to be paid or on account of the $600 paid. (At most, this says that if the lease is terminated plaintiff will not have a claim either for six months' free occupancy or for repayment of the $600. It does call for interpretation of the scope of the expression ''for any cause or reason whatsoever.'' The eviction of plaintiff by defendants was the cause of the termination which has occurred.) In their lease the parties proceeded further and said: The $600 payment is the consideration for the making of this lease and for the purpose of obtaining the lease and is an absolute payment for that purpose. (In other words, plaintiff bought a three-year lease for $600. Because of defendants' violation of their obligations, it turned out to be but a two years' and four months' tenure.)

The conclusion seems inescapable that defendants owe plaintiff six months of free use and occupancy of this store unless the termination exculpatory clause must be construed as if it concluded with the words: ''for any cause or reason what-

soever, *including the wrongful eviction of the lessee by the lessors.*" It is difficult to believe that plaintiff read the italicized words into that clause when he examined and signed the lease. Yet it would be virtually necessary to read those italicized words in if we were to accept defendants' version of the words used. It is conceivable that a lessee might take the chance of losing his six months of free occupancy should the building be destroyed by storm, earthquake or fire, or should some third person successfully assert a superior title and take the property over, if in any such case the loss occur without fault of the lessor. It would be quite another thing for a lessee to buy a lease on the express understanding that he would enjoy the last six months of the term rent free if he faithfully perform all of his obligations, but subject to a *power* in the lessor *at any time* to cancel that right by *affirmatively* violating one of his own obligations, that of according the lessee quiet enjoyment of the demised premises. The two concepts are so utterly repugnant it would require more explicit terms than we have here to find that the minds of the parties met and agreed that the defendants should have any such power.

We believe this is the correct interpretation. Giving the words their ordinary and customary meaning, we would have to read a good deal into this lease to find an agreement by the parties to treat the $600 as an advance payment for rent or as security for the performance of plaintiff's obligation under the lease. In this respect it differs from such cases as *Walter H. Sullivan, Inc.* v. *Johnson,* 116 Cal.App. 591 [3 P.2d 72], which involved a lease containing a somewhat similar provision, but in which the parties specified in respect to the amount paid ($2,500) that " 'the Lessor will pay the Lessee interest at the rate of six (6) per cent per annum upon the said sum of two thousand five hundred ($2500) . . . which said interest shall be payable annually . . . and the Lessor will credit the Lessee with the said sum . . . upon the five (5) instalments of rent of the said premises last maturing . . . at the rate of five hundred dollars ($500) upon each of the said instalments of rent.' " (P. 592.) The court deemed the quoted provisions indicative of an intent not to treat the $2,500 "as an absolute payment in consideration for the execution of the lease" (p. 593). We find no such or similar words in the lease before us which indicate an intent to treat the $600 payment other than as consideration for the lease,

an absolute payment. Significant in this connection is a later decision by the court which decided the Walter H. Sullivan, Inc. case. We refer to *A-1 Garage* v. *Lange Investment Co.*, 6 Cal.App.2d 593 [44 P.2d 681]. The lease there involved characterized an advance payment as made in consideration for the making of the lease and as an absolute payment for that purpose. The court held that when the money is paid under such circumstances, the lessor is entitled to retain the fund on default of the lessee. In the course of its discussion the court referred to its decision in the Walter H. Sullivan, Inc. case, directing attention to the fact that the lease there involved contained clauses which were rendered uncertain by the peculiar language used, and that examination of those clauses, in the light of the surrounding circumstances and the interpretation placed upon those clauses by the parties themselves, compelled the conclusion that the money there paid in advance was a security for faithful performance by the lessee and not otherwise.

Defendants cite a number of cases in which the advance payment was deemed absolute in nature and not returnable to the lessee upon termination of the lease. However, in those cases termination occurred because of a default by the lessee in the performance of one or another of his obligations. In *Curtis* v. *Arnold*, 43 Cal.App. 97 [184 P. 510], and *Anderson* v. *Julius Levin Co.*, 71 Cal.App. 73 [234 P. 442], the lessee relinquished possession after default by him in the payment of rent. In *Parigian* v. *Citizens Nat. Trust & Savings Bank*, 42 Cal.App.2d 773 [110 P.2d 117], cancellation was brought about by the conduct of a sublessee. In *Grand Central Public Market* v. *Kojima*, 11 Cal.App.2d 712, 717 [54 P.2d 786], the lessee unsuccessfully claimed that the lease had been terminated, in an action brought by the lessor for overdue rent. It does not follow therefrom that in the case before us plaintiff was not entitled to damages for the loss of his right to six months' free use and occupancy, a loss caused by his wrongful eviction by the defendants.

We conclude, therefore, that one of the elements of recoverable damages sustained by plaintiff upon his eviction was the value of his right to six months' free use and occupancy of these premises. That value, the trial court did not determine when it treated the $600 as a "deposit" to secure faithful performance by plaintiff. That value might be the same as or greater or less than the amount of the stipulated

rental. It is a question of fact yet to be determined by the trial court.

■ (4) *Concerning the injury to plaintiff's stock in trade, equipment and other personal property,* caused by the water from defendants' plumbing facilities, plaintiff's right to recovery depends upon the meaning and scope of a certain exculpatory clause of the lease.

That clause reads as follows: "It is agreed by the parties hereto, that said Lessor shall not be liable for damages to any goods, property, or effects in or upon said demised premises, caused by gas, water, or other fluid from any source whatsoever."

Those words are all inclusive. They seem to preclude any possibility of recovery by the plaintiff. ■ "Such broad language, however, is to be read in the light of the subject matter of the contract and the apparent intention of the parties." (*Eastman Oil etc. Corp.* v. *Lane-Wells Co.,* 21 Cal.2d 872, 873 [136 P.2d 564], and cases cited.)

■ In their application to the facts of this case, the words used in this clause involve a contract which has for its object the exemption of the defendants from responsibility for their own misconduct in knowingly maintaining defective sewerage facilities and in taking patently inadequate measures for the repair of those facilities, with knowledge of the injuries to plaintiff's property which would ensue. This misconduct was, at the very least, active or affirmative negligence, not mere ordinary negligence. It comes very close to being wilful misconduct, for exemption from the consequences of which a person may not contract. (Civ. Code, § 1668.) Also this particular affirmative negligence of the defendants constituted a violation of their obligation to accord plaintiff quiet enjoyment of the very premises demised. We cannot, without more explicit and specific words in this clause, conclude that the minds of the parties met and agreed to exempt the defendants from the consequences of their own wrongful acts when of the kind and nature of those here involved.

Defendants have cited a number of decisions on exculpatory clauses which seemingly arrive at a different result. We are not persuaded. Each contract must be viewed in its own setting, and applied to the particular set of facts presented to a court for consideration.

One of the decisions upon which defendants rely is *Inglis* v. *Garland,* 19 Cal.App.2d Supp. 767 [64 P.2d 501]. It stands, at most, for the doctrine that the lessor may by contract exempt

himself from responsibility for injury to his lessee's property caused by the ordinary negligence of the lessor. It held that the following clause did that: " 'Tenant agrees that Tenant will not, and that agents, servants and others claiming the right under Tenants to be in the premises or in said building . . . shall not make any claim against Landlord for any injury, loss or damage to person or property occurring therein from any cause.' " (P. 770.) This clause was deemed a covenant not to sue, and the court placed some emphasis upon the fact that in it the tenant referred both to the premises leased and to the building of which those premises were but a part. The water which caused the damage came from a pipe which was embedded in an outer wall and carried rain water from the roof to an underground drain. Upon the occasion of the first leak, the tenant brought it to the attention of the landlord who "made *bona fide* efforts through competent agents to find and stop the leak but apparently both plaintiff and defendant, influenced somewhat probably by their knowledge that the new roof had been installed only a few months before, by a competent roofing agent, placed the blame for the leak upon the sign and failed to ascertain, as subsequent events suggest they easily could have done, that the earthenware drain pipe above mentioned had become clogged." (P. 769.) Later, a further rain occurred and a further examination was promptly made, as a result of which the cause was discovered and repairs made. The trial court impliedly found the landlord negligent in not having discovered and remedied the condition prior to the last rain, but the reviewing court concluded that "the circumstances related, coupled with others appearing in the record, are clearly not sufficient as a matter of law to support such finding." (P. 770.) We do not see that the decision in the Inglis case, viewed in the light of its facts, is persuasively applicable to the facts of the case now before us. Another case invoked by defendants is *Werner* v. *Knoll*, 89 Cal.App.2d 474 [201 P.2d 45]. It involved an appeal from a judgment in favor of a landlord. The judgment was predicated upon a clause of the lease which stipulated that the defendant landlord " 'shall not be liable for any damage arising from personal injuries sustained by any person . . ., in, on, or about said premises, from any cause whatsoever, and second party [plaintiff] agrees to save and keep first party free and harmless of and from any such liability, loss or damage.' " (P. 475.) The appellant raised "but one question, the validity of this

provision.'' (P. 475.) The court found it valid, to the extent of relieving the landlord of the consequences of his own negligence. As we read the decision, the court was speaking of ordinary negligence, the want of ordinary care. That falls quite short of affirmative negligence involved in the instant case.

Such decisions are not persuasive of a different view than that which we have expressed. We observe, also, that the trend of decisions is to exclude from such general clauses the exemption of a landlord from the consequences of his own affirmative negligence; i. e., a species of exemption not intended by the parties unless clearly and in more specific terms expressed. (See cases collected in 175 A.L.R. 8, at 89-92, § 47.)

Since the portion of the judgment which awards plaintiff damages is in a lump sum ($3,266.63), that portion is reversed with instructions to the trial court (1) to set aside its finding and conclusion that the $600 paid by plaintiff upon execution of the lease was a deposit to secure performance of his obligations under the lease, (2) to retry and determine the value of plaintiff's right to six months' free occupancy of the demised premises, (3) to set aside its conclusion that plaintiff is not entitled to damages sustained to his stock in trade, equipment, and other personal property, (4) to retry and determine the amount of damages sustained to plaintiff's equipment and other personal property, except the damages to the stock in trade which the court has already found and determined, and (5) then to make supplemental findings of fact and conclusions of law not inconsistent with this opinion, and to render judgment accordingly. The portion of the judgment which awards plaintiff his costs and disbursements incurred or expended in the action, is affirmed.

The appeal from the order denying defendants' motion for a new trial, a nonappealable order, is dismissed.

Plaintiff is to recover his costs on all the appeals.

Peters, P. J., and Bray, J., concurred.