MEYER JEWELRY COMPANY, a Corporation, Respondent,

v.

PROFESSIONAL BUILDING COMPANY,
a Corporation, Appellant,
U. S. Engineering Company, a Corporation
(Defendants).

No. 22645.

Kansas City Court of Appeals.

Missouri.

Dec. 2, 1957.

Lowell L. Knipmeyer, Knipmeyer, McCann & Sanders, Kansas City, for appellant.

Robert S. Burns, Kansas City, for respondent.

BROADDUS, Presiding Judge.

This action was instituted by the plaintiff, Meyer Jewelry Company, for property damage against the defendants U. S. Engineering Company and Professional Building Company. The amended petition alleges that plaintiff occupied a portion of the first floor and basement of a building operated by defendant Professional Building Company and that it owned, maintained and exercised complete control over the plumbing, water and sewage systems in the aforesaid building; that the defendant Professional Building on February 5, 1953, engaged the defendant U. S. Engineering Company to install a new sewer pipe in the basement of the aforesaid building and in the premises occupied by the plaintiff; that the defendant U. S. Engineering Company was the agent of defendant Professional Building in installing the new sewer pipe; that it was the duty of the defendants to keep the water systems in such condition so as not to damage plaintiff's property.

Under Count I of plaintiff's petition, it is alleged that on the night of February 5, 1953, the defendants did repair work on the sewage system in a portion of the premises occupied by plaintiff as a storeroom and in so doing negligently and carelessly turned off the water system servicing the portion of the premises occupied by plaintiff and then negligently and carelessly turned the water system back on without a

previous investigation as to whether the faucets to a sink in said storeroom were opened but instead negligently and carelessly left a faucet or faucets in said storeroom open and turned on and negligently and carelessly allowed said faucet or faucets to run and to overflow that portion of the premises occupied by plaintiff as a storeroom. Under Count I damages were sought in the amount of $4,128.15.

Under Count II it was alleged that on the night of February 5, 1953, the defendants did repair work on the sewage system of the premises occupied by plaintiff and negligently and carelessly turned off the water system to that portion of the premises occupied by plaintiff and then during the early morning of February 6, 1953, carelessly and negligently turned on said water system without a previous investigation as to whether faucets or other water outlets in the portion of the basement premises occupied by plaintiff were open or closed and carelessly and negligently allowed a faucet to remain open and to overflow, flooding that portion of the basement premises occupied by plaintiff as offices. Damages under Count II were sought in the sum of $7,013.66.

Trial was begun on the 22nd day of October, 1956 before the Court, a jury having been waived.

At the conclusion of the trial, the Court took the matter under advisement and on January 31, 1957, entered judgment in favor of plaintiff under Count I as to defendant Professional Building Company and as to defendant U. S. Engineering Company in the sum of $2,780.17; and under Count II rendered judgment against the defendant Professional Building in the sum of $4,754.89, and found the issues for defendant U. S. Engineering Company on Count II.

Thereafter the defendant Professional Building Company took an appeal to this court. The plaintiff did not appeal from the judgment rendered in favor of defendant U. S. Engineering Company under Count II and the defendant U. S. Engineer-

ing Company did not appeal from the judgment rendered against it under Count I. The judgment against the U. S. Engineering Company on Count I of the plaintiff's petition, is therefore final. Respondent remitted the sum of $35.06, and thus the amount in dispute is within the jurisdiction of this court.

The Meyer Jewelry Company, respondent, was the distributor and wholesaler of jewelry merchandise and its place of business was located in the Professional Building at 1105 Grand Avenue, Kansas City, Missouri, where it occupied the premises as a tenant of the appellant Professional Building. Respondent occupied a portion of the first floor of the Professional Building and a portion of the basement, which is on the west side of the building, and also a storage room in the basement. The storage room and the other portion of the basement used by respondent were separate and apart and the main area of the basement occupied by respondent was used as a warehousing and order-filling department for merchandise. The storage room was used for storage of various supplies. In the storage room was a sink with two faucets and in the main portion of the basement premises occupied by respondent were two restrooms, a coffee bar and a drinking fountain; there was a sink in the coffee bar with one faucet with two valves.

The Professional Building was enlarging its sewer system with a new eight inch line and this work was being done by the U. S. Engineering Company, under contract. Appellant had no key to the door to the storage room or to the main portion of the basement premises occupied by respondent. Appellant notified respondent that there was to be some plumbing work done during the evening of February 5, 1953, and requested respondent to have an employee present to let the workmen in and out of the storage room. Accordingly respondent notified one of its porters to stay with the workmen until the work was completed. Appellant's representative McDonald stayed on the job so he could turn

off the water valves to the attic of the building. Work commenced in the storage room between 6:00 and 6:30 p. m. and the plumbers of the Engineering Company were admitted to the storage room by respondent. At the request of the Engineering Company, McDonald went to the attic of the building and turned the water system off; it was necessary to turn the water off in connection with the work; when McDonald returned to the storage room, water was draining from the faucets. Work continued in the storage room until approximately 10:00 p. m. and when the plumbing work was completed McDonald went back to the attic on the 16th floor of the building and turned the valves back on. When McDonald returned from the attic, it was noticed that there was some water running out from under the storage room door and McDonald then went back to the attic and cut down the valves again. The door to the storage room had been locked and closed at the conclusion of the work and in order to get back into the storage room, it was necessary to remove the door from its hinges. At that time McDonald observed water running over the sink onto the floor. McDonald didn't remember whether water was running out of the faucets or whether they were already turned off, but he stated that the water had to come from the faucets. The water was mopped up and certain merchandise was taken out of the storage room and into the main portion of the basement premises occupied by respondent after the door into the main premises had been unlocked by respondent. Respondent's Vice-President, Hancock, was notified that there was water running out from under the storage room door and upon his arrival at the scene he supervised the removal of some of the wet merchandise, which had been in the storage room, into the main portion of respondent's premises. Hancock checked the faucets in the storage room and determined that the water was off and when he finally went home that night the main area of the basement was completely dry and he heard no water dripping. The removal work continued until about 2:00 in the morning when apparently every one went home. McDonald testified that he did not check the faucets in the storage room; that he didn't remember who turned the faucets off. One of the plumbers testified that he didn't know who turned the faucets on in the storage room, but before the installation could be done it was necessary that the system be drained; that some of the plumbers evidently opened the faucet and drained it, but he doesn't know which one of the plumbers did it, but he does recall the water draining out and told McDonald that the water could be turned back on. At the conclusion of the work in the storage room, respondent's porter closed the door to the storage room. The porter testified that he did not turn the faucets on or off in the storage room; that when he was told by the plumbers that the work was finished, he went back into the main portion of the premises and then went home.

The second loss occurred in the main area of the basement used by respondent. In this area is a coffee bar maintained by respondent for the use of its employees. Respondent never had any difficulty with the faucets in the coffee bar; and it is not definite from the record as to when the second loss was discovered or by whom, but apparently it was discovered by respondent the following morning. After the first loss had been cleaned up, respondent's employees, appellant's employee, and the Engineering Company's employees went home. The clean-up work in connection with the first loss was completed at approximately 2:30 a. m. The water damage in the second loss must, therefore, have occurred some time between 2:30 a. m. and the following morning.

In addition to the coffee bar in the main part of the premises occupied by respondent, there were also a drinking fountain and two restrooms; there was a sink in the coffee bar with one faucet with two valves. As stated, after the first loss was discovered, some of the damaged merchandise was moved to the main portion of the base-

ment premises. No one went in the coffee shop, and at the conclusion of the removal work, respondent's witness locked the basement door and went home. Respondent's Vice-President checked the faucets in the storage room before he went home, but he did not check the faucets in the washrooms or in the coffee bar to see if they were turned off.

No engineering or plumbing work was done in connection with the portion of the premises occupied by respondent in the second loss, and neither the appellant's representative nor the Engineering Company's employees did any work in the main portion of the premises occupied by respondent. Appellant's representative, defendant Engineering Company's employees and respondent's employees denied ever handling the faucets in the main portion of the premises. The porter for the respondent testified that he did not adjust the faucets in the coffee shop and that when he went home there was no water dripping out of the faucets or any water damage; that he had cleaned up the coffee bar at 5:00 p. m., rinsed the dishes and cups and shut the water off; that he went back into the coffee bar at closing time to see if everything was all right; that he looked at the faucets and they were in an off position; that he is certain that the faucets were off in the coffee bar and off in the men's and women's washrooms.

Appellant's representative testified that he did not check any of the valves or faucets in the main area after the water was turned on the second time; that when he came to work the next morning he saw water in the public corridor, coming through the main area; that although the witness was not certain, it was his opinion that the water from the second flood came from the coffee room. The next morning there was some three to six inches of water in the main portion of the premises.

Appellant offered no evidence, but did introduce Exhibit No. 9 which was a lease between the appellant and respondent.

Appellant's first contention is that the judgment is erroneous because under the lease arrangement between respondent and appellant, the appellant was absolved from any responsibility for water damage. That portion of the lease upon which appellant relies is as follows.

"The Lessor shall not be liable for any damage occasioned by failure to keep said premises in repair and shall not be liable for any damage done to property or any person in said building at any time by steam, gas, or electricity, or from water, rain or snow which may leak into, issue and flow from any part of said building of which said premises hereby leased are a part, or from the pipes or plumbing works or sewerage, or from the bursting, leaking or running over of any tank washstand, water closet or waste pipe in, above or upon or about said building or premises, or from any other place or quarters, or from any damages arising from the acts or negligence of co-tenants or other occupants of the same building, or of any owners or occupants of adjacent or contiguous property."

The above provision does not exempt the landlord from liability due to its negligence. As is to be seen, the first part of the provision deals with damages occasioned by certain causes within the control of the appellant-landlord, and the latter part deals with damages arising from acts or causes of co-tenants, occupants of the same building, and owners or occupants of the same building, and owners or occupants of adjacent property. When discussing damages caused by co-tenants and others than the landlord the lease says: "arising from the acts or *negligence* of the co-tenants \* \*," but at no time is the word "negligence" used in the lease with regard to damages caused by acts of the landlord.

In the case of Freddi-Gail, Inc. v. Royal Building Corp., 1955, 34 N.J.Super. 142, 111 A.2d 636, 637 it is said:

"According to the weight of authority at the common law, an exculpatory clause

exempting a landlord from liability for damage by water or some other cause, *without clearly adverting to the matter of negligence on the landlord's part, does not absolve him from his own negligence, at least from negligence of an affirmative sort.* It is said that the minds of both parties probably never intended such absolution. The strict construction thus given to the clause is in part to be laid to the disfavor with which these authorities look upon any possible attempt by a landlord to secure exoneration from his own wrongdoing. Cairnes v. Hillman Drug Co., 214 Ala. 545, 108 So. 362 (Sup.Ct.1926); Butt v. Bertola, 110 Cal. App.2d 128, 242 P.2d 32, 39 (Ct.App.1952); Cerny Pickas & Co. v. C. R. Jahn Co., 347 Ill.App. 379, 106 N.E.2d 828 (App.Ct.1952); Oscar Ruff Drug Co. v. Western Iowa Co., 191 Iowa, 1035, 181 N.W. 408, 15 A.L.R. 962 (Sup.Ct.1921); Nashua Gummed & Coated Paper Co. v. Noyes Buick Co., 93 N.H. 348, 41 A.2d 920 (Sup.Ct.1945); Kessler v. The Ansonia, 253 N.Y. 453, 171 N.E. 704 (Ct.App.1930); Eugene C. Lewis Co. v. Metropolitan Realty Co., 112 App.Div. 385, 98 N.Y.S. 391 (1906), affirmed 189 N.Y. 534, 82 N.E. 1126 (Ct.App.1907); Simmons v. Pagones, 66 S.D. 296, 282 N.W. 257 (Sup. Ct.1938); Le Vette v. Hardman Estate, 77 Wash. 320, 137 P. 454, L.R.A.1917B, 222 (Sup.Ct.1914); cf. Kirshenbaum v. General Outdoor Advertising Co., 258 N.Y. 489, 180 N.E. 245, 246, 250, 84 A.L.R. 645 (Ct.App. 1932); Railton v. Taylor, 20 R.I. 279, 38 A. 980, 39 L.R.A. 246 (Sup.Ct.1897); Johnson v. Prange-Geussenhainer Co., 240 Wis. 363, 2 N.W.2d 723, 729 (Sup.Ct.1942); 6 Willston Contracts (rev. ed.) § 1751C; 15 Ga.Bar J. 389, 391 (1953); 42 Yale L.J. 139, 140 (1932); 175 A.L.R. 8,89; Prosser Torts (1941), 382."

The New York case of Kessler cited in the above quotation had the approval of the distinguished judges Cardozo, Pound and Lehman. More recent cases to the same effect are Bauer v. 141–149 Cedar Lane Holding Co., 1956, 42 N.J.Super. 110, 125 A.2d 884 and Sears-Roebuck & Co. v. Poling, Iowa 1957, 81 N.W.2d 462.

This court in Goldman v. White & Davis Ins. Co., 225 Mo.App. 1023, 38 S.W. 2d 62, announced the same rule. However, as we later pointed out in Rodier v. Kline's Inc., 226 Mo.App. 474, 47 S.W.2d 230, 232, the Goldman case was decided by two judges, only one of whom concurred in the result, and thus the opinion in that case was not the opinion of the court. The Rodier case did not involve active negligence of the landlord. Neither did the case of Gralnick v. Magid, 292 Mo. 391, 238 S.W. 132, 28 A.L.R. 1530, relied upon by appellant. The case of Kansas City Stock Yards Co. v. A. Reich & Sons, Mo.Supp., 250 S.W.2d 692, also relied upon by appellant does not consider the question of whether or not the contract specifically excepted against negligent acts of the landlord, but instead it is twice stated, loc. cit. 697, in that opinion, that the oral lease was that there would be exemption from liability for damages from fire for any cause, *including defendant's negligence.*

In line with the great weight of authority we hold that since the lease does not in plain terms exonerate the appellant-landlord from its own acts of negligence, it does not bar plaintiff's claims.

■ Appellant also contends that "respondent failed to establish negligence on the part of appellant that proximately caused the first water damage (Count I)." Under the undisputed evidence Mr. McDonald, appellant's employee, remained on the job the evening of February 5th to turn off the water valves, which were located in the attic between the roof and the 16th floor. The pipes had to be drained before the plumbers could do the welding. McDonald went to the attic and turned the water off. When he got back to the storage room the two faucets in the sink were open and water was draining from them. When the plumbers were through with their work, which was about 10 o'clock, McDonald went back to the attic and turned the valves on. Within 5 to 10 minutes he returned to the basement and saw water flowing from underneath the door of the

storage room. When the door was removed water was seen running over the sink onto the floor and, according to McDonald "it had to come from those faucets." The only reasonable inference to be drawn from the evidence is that these faucets were not closed before McDonald returned to the attic to turn the water on again. He testified that he "didn't check" to see if they "had been turned off". Thus, under his own admission, he was guilty of negligence.

It is likewise contended that the evidence failed to establish negligence on the part of appellant which resulted in the second water loss (Count II). The evidence was that the water in the second floor was hot and that it came from the coffee bar, which was located in the main portion of the basement used by respondent. The evidence also was that the hot water valve which McDonald had turned off and on was also connected with the coffee bar, yet, possessed with this knowledge, McDonald admitted that when the task of mopping up and moving goods was over he "didn't check any of the valves or faucets in the main area at all." He just "went back upstairs and turned the water on and went home." The contention is without merit.

Under its point IV appellant contends that respondent is not the real party in interest. Respondent submitted proofs of loss to its insurance carriers, The Home Insurance Company and the American Central Insurance Company, and was paid by them. Thus, appellant says, "the insurance companies are the real parties in interest in this lawsuit." We hold otherwise based upon our ruling in the case of Swift and Company v. Wabash R. Co., 149 Mo.App. 526, 131 S.W. 124 where the question was fully discussed.

Appellant also contends that respondent did not prove that it was the owner of all the property involved in the proofs of loss. These proofs were also signed by Rubenstein's Antique Shop and Meyer Jewelry Company of Colorado, both named as insureds in the policies. The only testimony in the record on the question came from Mr. Becker, secretary-treasurer of respondent. He testified that none of the items contained in the proofs belonged to either the Colorado Company or to the Antique Shop; that the only explanation he could offer for the proofs being signed by them was the fact that their names also appeared in the policies.

Finally, appellant asserts that "the damages resulting from the separate losses are speculative." There is no real basis for this contention. Respondent offered in evidence Exhibits 6 and 7. Mr. Becker testified that the items set out in Exhibit 6 were in the storeroom when the first flooding occurred, and that the merchandise listed in Exhibit 7 was in "the main premises", and was "damaged in the second loss."

The case was well tried. The judgment is affirmed. All concur.