Charles ALACK, Respondent/Cross–Appellant,

v.

**VIC TANNY INTERNATIONAL OF MISSOURI, INC., et al., Appellants/Cross–Respondents.**

No. 78423.

Supreme Court of Missouri, En Banc.

May 28, 1996.

Anthony J. Sestric, St. Louis, for Appellants/Cross Respondents.

James D. Ross, St. Louis, for Respondent/Cross–Appellant.

PRICE, Justice.

Plaintiff was injured while using health club facilities. He had signed a two-page, seventeen-paragraph "Retail Installment Contract" containing a general exculpatory clause. The clause, however, did not expressly release the health club from injuries resulting from its own negligence. The trial court ruled that the exculpatory clause did not bar plaintiff's negligence action as a matter of law, but the trial court allowed the contract as evidence and submitted the issue to the jury as a matter of fact. The jury returned a verdict for plaintiff in the amount of $17,000.

We hold that the exculpatory clause was ambiguous and that defendant health club did not insulate itself from liability for future negligence because the exculpatory clause did not use the word "negligence" or "fault" or their equivalents so that a clear and unmistakable waiver occurred. We further hold that the trial court correctly denied the plaintiff's motion for a new trial on damages and plaintiff's request for an instruction on punitive damages. The judgment of the trial court is affirmed.

## I.

In 1982, Charles Alack became a member of Vic Tanny International of Missouri, Inc., a health club facility. Alack was encouraged to engage in a specific cardiovascular workout routine known as the "Super Circuit". During this routine, a member was instructed to exercise on ten different weight machines while running a lap between each exercise. The weight machines used during a "Super Circuit" were specifically chosen because they required only a selection of weight amount prior to their use and would not interrupt the cardiovascular nature of the routine.

While using an upright row machine during a "Super Circuit", the machine's handle disengaged from the weight cable and smashed into Alack's mouth and jaw. Alack suffered injuries to his mouth and lips, including several loose and broken teeth. As

of the trial, Alack had seen his dentist over 20 times, had undergone two surgeries, and was scheduled for a third surgery. While the surgeries relieved some of Alack's pain, his temporomandibular joint remained displaced. Alack testified that he will be subject to additional jaw problems, including arthritic changes, and might require additional surgery in the future. Alack had already incurred, or was committed to incur, $17,000.00 in medical expenses for these surgical and dental procedures.

The handle of the machine was connected without the necessary clevis pin placed between the cable and the pigtail hook. The manufacturer originally designed, manufactured, and shipped the machine with the clevis pin in place. The manufacturer also provided a user manual warning that keeping the equipment correctly assembled was "critically important to user safety."[1] At trial, maintenance employees of Vic Tanny acknowledged that the work-out machine could be dangerous if used without the clevis pin. It was also acknowledged that Vic Tanny did not require periodic inspections by any specifically designated employee to make certain that the clevis pin was in place.

On cross-examination, Alack was questioned about his Vic Tanny "Retail Installment Contract", including a paragraph purporting to release Vic Tanny from "any and all claims" against it.[2] At no place in the membership contract does Alack expressly agree to release Vic Tanny from its own future negligence or fault. All seventeen of the paragraphs on the form-contract were printed with the same-sized lettering. Nothing made Paragraph G, or any of the language contained therein, conspicuously stand out. Alack signed the contract near the bottom of the first page. Paragraph G was on the back side of the contract.

During trial, Vic Tanny initially used the exculpatory paragraph to demonstrate that Alack was aware that injuries could occur during a workout session. Then Alack used the paragraph to explain that he believed he was only releasing Vic Tanny from any injuries caused if he attempted to lift too much weight or workout for too long of a period. Alack explained what the clause meant to him during direct examination:

Q. (By Alack's attorney) And having read that language what was your understanding as to what that language meant?

A. (By Alack) That language to me meant that if—It's somewhat of a limitation of liability intended. And to me it meant that if I did something, sprained my back, which I have done, sprained ankle or whatever in working out with the weights that they're not liable.

＊　＊　＊　＊　＊　＊

Q. Did you understand that language to mean that if Vic Tanny was negligent and that negligence resulted in injury to you that you could not bring a claim against Vic Tanny for negligence?

A. No, that was not my understanding.

---

1. Alack also brought a product liability claim against the machine's manufacturer. However, the machine was shipped with the clevis pin properly in place. The missing clevis pin must have been removed after delivery. As a result of this material change in the machine by Vic Tanny, the trial court entered a directed verdict in favor of the manufacturer with respect to Alack's product liability claim. Alack is not appealing that ruling.

2. Paragraph G of the contract stated:
    By the use of the facilities of Seller and/or by the attendance at any of the gymnasiums owned by Seller, the Member expressly agrees that Seller shall not be liable for any damages arising from personal injuries sustained by the Member or his guest in, on or about the premises of the said gymnasiums or as a result of their using the facilities and the equipment therein. By the execution of this agreement

Member assumes full responsibility of any such injuries or damages which may occur to the Member or guest in, on or about the said gymnasiums and further agrees that Seller shall not be liable for any loss or theft of personal property. Member assumes full responsibility for any injuries, damages or losses which may occur to Member or guest, in, on or about the premises of said gymnasiums and does hereby fully and forever release and discharge Seller and all associated gymnasiums, their owners, employees and agents from any and all claims, demands, damages, rights of action, or causes of action, present or future, whether the same be known or unknown, anticipated, or unanticipated, resulting from or arising out of the Member's or his guests use or intended use of the said gymnasium or the facilities and equipment thereof.

Finally, Vic Tanny argued that the exculpatory clause entitled it to a directed verdict because Paragraph G bars any negligence claim by Alack as a matter of law. The trial judge decided to submit the issue to the jury. The jury was instructed that it could find in favor of Vic Tanny only if it believed that, when Alack signed the membership agreement, he had agreed to release Vic Tanny from the type of claim involved in this case. The jury returned a verdict against Vic Tanny on Alack's negligence count, and awarded Alack $17,000.00 in damages. Vic Tanny filed a motion for judgment notwithstanding the verdict. Alack filed a motion for a new trial on the issue of damages or, in the alternative, to increase the jury award. Both motions were overruled by the trial court.

Vic Tanny appeals, alleging: 1) that the trial court erred in denying Vic Tanny a directed verdict as a matter of law on Alack's negligence claim because of the exculpatory membership contract; 2) that the trial court erred in allowing Alack to testify to his understanding of the membership agreement because the agreement contained clear and unambiguous language not to be contradicted by parol evidence; and 3) that the trial court erred in refusing Vic Tanny's proffered instruction that provided an affirmative defense based on the release contained in the membership contract.

Alack cross-appeals, alleging: 1) that the trial court erred in allowing the exculpatory language of the membership contract into evidence because it was irrelevant and prejudicial, and, therefore, he is entitled to a new trial on damages; and 2) that the trial court erred in refusing to submit an instruction on the issue of punitive damages because the jurors could have found that Vic Tanny demonstrated complete indifference to or conscious disregard for the safety of others.

## II.

### A. *Release From Future Negligence*

#### *1.*

Although exculpatory clauses in contracts releasing an individual from his or her own future negligence are disfavored, they are not prohibited as against public policy. *Rock Springs Realty, Inc. v. Waid,* 392 S.W.2d 270, 272 (Mo.1965). However, contracts exonerating a party from acts of future negligence are to be "strictly construed against the party claiming the benefit of the contract, and clear and explicit language in the contract is required to absolve a person from such liability." *Hornbeck v. All American Indoor Sports, Inc.,* 898 S.W.2d 717, 721 (Mo.App.1995). It is a "well-established rule of construction that a contract provision exempting one from liability for his or her negligence will never be implied but must be clearly and explicitly stated." *Poslosky v. Firestone Tire and Rubber Co.,* 349 S.W.2d 847, 850 (Mo.1961).

#### *2.*

Most states have enforced exculpatory clauses when they include specific references to the negligence or fault of the drafter. In *Dresser Industries, Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508–509 (Tex.1993), the Texas Supreme Court applied an "express negligence doctrine" that requires a release to specifically express the intent of a party to be relieved from his or her own negligence. The court explained that indemnity agreements, releases, exculpatory agreements, or waivers are extraordinary methods of shifting the risk of negligent conduct. *Id.* at 508. Therefore, individuals wishing to protect themselves from their own negligence "must express that intent in specific terms within the four corners of the contract." *Id.*

In *Gross v. Sweet,* 49 N.Y.2d 102, 424 N.Y.S.2d 365, 367–368, 400 N.E.2d 306, 309 (1979), the New York Court of Appeals first noted the following principles of law regarding the construction of exculpatory language:

> As the cases make clear, the law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which courts measure their validity. So, it has been repeatedly emphasized that unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts [citations omitted]. Put another way, it must appear plainly and precisely that

the "limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility" [citations omitted].

Not only does this stringent standard require that the drafter of such an agreement make its terms unambiguous, but it mandates that the terms be understandable as well. Thus, a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon. [citations omitted].

The court then held that a release providing that "I ... waive any and all claims", language remarkably similar to that used in the present case, was insufficient to bar a personal injury action for negligence because the release "nowhere expresses any intention to exempt the defendant from liability for injury or property damages which may result from his failure to use due care...." *Id.* 424 N.Y.S.2d at 369–70, 400 N.E.2d at 311. In requiring the use of the word "negligence" or "words conveying a similar import" the court noted that while one might accept the risks inherently associated with any particular activity, "it does not follow that he was aware of, much less intended to accept, any *enhanced* exposure to injury occasioned by the carelessness of the very persons on which he depended for his safety." *Id.* 424 N.Y.S.2d at 368–70, 400 N.E.2d at 310–11 (emphasis in original). *See also Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920, 923 (Minn.1982) (barring claim when "negligence" stated in release); *Doyle v. Bowdoin College,* 403 A.2d 1206, 1208 (Me.1979) (holding the release must use the "greatest particularity" to extinguish negligence liability and there must be an express reference to liability for negligence); *Geise v. County of Niagara,* 117 Misc.2d 470, 458 N.Y.S.2d 162, 164 (N.Y.Supp.1983) (explaining that a negligence claim was not barred unless words referring to the "neglect" or "fault" of the defendant were used in the release); *Haugen v. Ford Motor Co.,* 219 N.W.2d 462, 470 (N.D.1974) (holding that there is no "plain and precise" limitation of liability without a reference to "negligence"); *Blum v. Kauffman,* 297 A.2d 48, 49 (Del.1972) (explaining that the word "negligence" was not in release and, there-

fore, did not "clearly and unequivocally" spell out the intent to grant such protection from liability for negligence); *Ciofalo v. Vic Tanney Gyms, Inc.,* 10 N.Y.2d 294, 220 N.Y.S.2d 962, 963–964, 177 N.E.2d 925, 926 (1961) (barring claim when "negligence" stated in release).

Other states have said that the word "negligence" is not necessarily required in an agreement in order to release a party from his or her own negligence. In *Audley v. Melton,* 138 N.H. 416, 640 A.2d 777 (1994), a model was bitten by a lion during a photography shoot. The model had signed a release stating she realized working with wild animals was potentially dangerous and that she released "the photographer, his/her agents or assigns from any and all liability whatsoever." *Id.* 640 A.2d at 778. The trial court granted the photographer summary judgment on the model's negligence claim. However, the New Hampshire Supreme Court reversed because the clause failed to bring particular attention "to the notion of releasing the defendant from liability for his own negligence." *Id.* 640 A.2d at 779. While the magic word "negligence" is not required, the language must "put plaintiff on clear notice of such intent." *Id.*

In *Boehm v. Cody Country Chamber of Commerce,* 748 P.2d 704 (Wyo.1987), a member of a gun club was injured during a mock gunfight. Because he had signed a release, the trial court granted summary judgment in favor of the defendant gun club, and the Wyoming Supreme Court affirmed. The release stated that the member shall "hold harmless and release [defendant], its agents and employees ... from any and all claims and damages which [plaintiff] may incur from participating in any and all activities sanctioned by [defendant]." *Id.* at 711. The court held that such language was a "clear and unambiguous" release of defendant from its own negligence liability even without the use of the word "negligence" in the release. *Id. See also Hardage Enterprises v. Fidesys Corp., N.V.,* 570 So.2d 436, 437 (Fla.App. 1990) (holding that the specific word "negligence" is not needed and "any and all claims" language will sufficiently bar a negligence claim); *Neumann v. Gloria Marshall Figure*

*Salon,* 149 Ill.App.3d 824, 102 Ill.Dec. 910, 913, 500 N.E.2d 1011, 1014 (1986) (explaining that specific reference to "negligence" is not required in an exculpatory clause in order to bar a negligence claim).

### 3.

Historically, Missouri appellate courts have required that a release from one's own future negligence be *explicitly* stated. In *Poslosky v. Firestone Tire and Rubber Co.,* 349 S.W.2d 847 (Mo.1961), this Court held that a tenant was not released from liability for negligently starting a fire when the lease did not contain clear language referring to exemption from negligence. Instead, the lease stated only that "Lessor agrees that it will ... keep the improvements on the said premises insured against fire ... and all moneys collected from such insurance shall be used toward the full compliance of the obligation of Lessor [to repair or restore the damaged premises]." *Id.* at 849. In holding this language inadequate, the Court noted the traditional rule of construction particular to exculpatory clauses by stating that "a contract provision exempting one from liability for his negligence will never be implied but must be explicitly stated." *Id.* at 850. *See also Phoenix Assur. Co. of N.Y. v. Royale Investment Co.,* 393 S.W.2d 43 (Mo.App. 1965) (explaining that language on back of a parking lot ticket did not shield hotel from its own negligence in allowing a car to be stolen because a release from negligence can never be implied, but must be clearly and explicitly stated); *Thomas v. Skelly Oil Co.,* 344 S.W.2d 320 (Mo.App.1960) (holding that indemnity and release agreement between a gas station and oil company did not immunize the oil company from immunity for an explosion caused by its own negligence because the agreement did not clearly refer to damage due to the negligence of oil company); *Meyer Jewelry Co. v. Professional Building Co.,* 307 S.W.2d 517 (Mo.App.1957) (finding that a landlord did not exonerate himself "in plain terms" from his own acts of negligence, but only shielded himself in the lease from acts of negligence by other tenants or third parties).

These concepts have recently been applied in *Vergano v. Facility Management of Missouri, Inc.,* 895 S.W.2d 126 (Mo.App.1995); and *Hornbeck v. All American Indoor Sports, Inc.,* 898 S.W.2d 717 (Mo.App.1995). In *Vergano,* the trial court granted summary judgment on a personal injury claim in favor of the operator of an ice skating arena. The plaintiff had claimed negligence in failing to maintain or repair the ice, but she had signed a valid release providing: "... I for myself and personal representatives, ... release, waive, discharge and covenant not to sue [ice arena operator] from all liability ... on account of injury to the person or property of the undersigned, *caused by the negligence* of [ice arena operator]...." 895 S.W.2d at 127 (emphasis added). The court of appeals affirmed the summary judgment and explained the release was an enforceable bar to plaintiff's claim because "its terms were simple and clear" and because "it was her free choice to release [ice arena operator] of a claim of negligence and skate, or refuse to execute the release and not skate." *Id.* at 128.

In *Hornbeck,* the trial court granted summary judgment in favor of the operator of an indoor soccer arena. The plaintiff had claimed the operator breached the duty of reasonable care to maintain the arena in a reasonably safe condition, resulting in personal injury to the plaintiff. In *Hornbeck,* the plaintiff had also signed a release stating: "... the undersigned person(s) hereby release [indoor soccer arena operator] from any and all claims, liability, loss of services and causes of action of any kind for personal injury and property damage arising in any way out of said participation...." 898 S.W.2d at 719–20. However, the court of appeals reversed the summary judgment because the release did not specifically contain the word "negligence". The court noted that contracts exonerating a party from acts of future negligence are to be "strictly construed against the party claiming the benefit of the contract, and clear and explicit language in the contract is required to absolve a person from such liability." *Id.* at 721. Applying this standard to the language of the release, the court then held that the language "does not clearly and unambiguously exoner-

ate [indoor soccer arena operator] from its own negligence." *Id.*

**4.**

■ We are persuaded that the best policy is to follow our previous decisions and those of other states that require clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence. The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence. Our traditional notions of justice are so fault-based that most people might not expect such a relationship to be altered, regardless of the length of an exculpatory clause, unless done so explicitly. General language will not suffice.

■ "A determination as to whether a [contract] is ambiguous is a question of law to be decided by the court." *Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 361 (Mo. banc 1991) (*citing Jim Carlson Construction, Inc. v. Bailey,* 769 S.W.2d 480, 482 (Mo.App.1989)). "An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Rodriguez v. General Accident Insurance Company of America,* 808 S.W.2d 379, 382 (Mo. banc 1991). In this case, the exculpatory clause purports to shield Vic Tanny from liability for "*any* damages", "*any* ... injuries" and "*any* and *all* claims, demands, damages, rights of action, present or future ... resulting from or arising out of the Member's ... use ... of said gymnasium or the facilities and equipment thereof." (emphasis added). Vic Tanny argues that this language is clear and unambiguous. In a theoretical vacuum, the words "any" and "all" might appear unambiguous: "all" means "[e]very" and "any" means "[a]ll." *Webster's Third New International Dictionary* 54, 97 (1976).

■ When viewed in the context of the law governing exculpatory clauses, however, this clause is ambiguous. "A 'latent ambiguity' arises where a writing on its face appears clear and unambiguous, but some collateral matter makes the meaning uncertain." *Royal Banks of Missouri v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991). As extensive as it is, the exculpatory clause at issue in this case is ambiguous because it did not specifically state that a member was releasing Vic Tanny for its own future negligence. *See Dresser Industries, Inc.,* 853 S.W.2d at 508; *Gross,* 400 N.E.2d at 309. Additionally, there is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest. *See Liberty Financial Management Corp. v. Beneficial Data Processing Corp.,* 670 S.W.2d 40, 48 (Mo.App.1984) (*citing 6A Corbin on Contracts,* § 1472 (1962)); 57A Am.Jur.2d *Negligence* §§ 49–67; 76 C.J.S. *Release* §§ 63–67; 4 *Williston on Contracts* § 602A (3d ed.). Yet the words used here would purport to include these claims, which cannot be waived. Although these claims were not asserted here, they demonstrate the ambiguity of the contractual language.[3] A contract that purports to relieve a party from any and all claims but does not actually do so is duplicitous, indistinct and uncertain.

Alack testified that he did not understand that he was releasing Vic Tanny from its own future negligence. Additionally, the twelve jurors found, as a matter of fact, that the exculpatory clause did not so release Vic Tanny. While this issue is to be decided as a matter of law, and should not have been submitted to the jury, our law on such an important point cannot be so out of step with the understanding of our citizens. The better rule is one that establishes a bright-line test, easy for courts to apply, and certain to alert all involved that the future "negligence" or "fault" of a party is being released. The words "negligence" or "fault" or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory

---

3. Plaintiff initially pleaded a count in gross negligence, but he appears to have waived this count

at trial and did not request an instruction on gross negligence.

clause actually understands what future claims he or she is waiving.[4]

Vic Tanny would like to make a distinction between indemnity contracts and exculpatory contracts. Vic Tanny argues that the exculpatory clause involved in this case should not be construed as strictly as the "indemnity contracts" were in *Poslosky, Phoenix Assur. Co. of N.Y., Thomas,* and *Meyer Jewelry Co., supra.* At least from the facts in this case, we see no good reason to adopt a lesser standard for a contract of release (which extinguishes liability) than would exist for a contract of indemnity (which merely shifts the liability from one party to another). *See Dresser Industries, Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 509 (Tex.1993).

The trial court did not err in denying Vic Tanny's request for a directed verdict because the exculpatory clause at issue did not meet the requirements discussed above. The point is denied.

### B. New Trial

■ Alack argues on appeal that a new trial should be granted with respect to damages because the trial court improperly allowed the exculpatory clause into evidence. The trial court also instructed the jurors, pursuant to MAI 32.21, that their verdict must be for defendant if they believe Alack signed a contract in which he released Vic Tanny "from the claims and injuries resulting from the occurrence mentioned in the evidence." The determination of the sufficiency and validity of an exculpatory agreement on the basis of the clarity and simplicity of its terms is a question of law for the trial court's determination. 57A Am.Jur.2d *Negligence* § 64; *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981). The jury should not have been allowed to consider the release, and the trial court erred by submitting this issue to the jury.

However, the jury proceeded to find that the release did not effectively shield Vic Tanny from its own negligence. The jury awarded Alack $17,000, which was the amount that Alack had demonstrated as past or current medical expenses. Alack argues that the

improper instruction concerning Vic Tanny's liability and the release's effectiveness prejudiced the jury's calculation of his damages.

We have previously required a plaintiff in this situation to "clearly ... demonstrate a relationship between a claimed inadequate verdict and an error in trial or submission of the liability issue." *Kohler v. McNeary,* 498 S.W.2d 796, 797 (Mo.1973). The following language in *Kohler* applies here:

> Plaintiff's motion for new trial and her appeal are premised on the theory that the grossly inadequate verdict was the result of the defendant's erroneous contributory negligence instruction. The difficulty with this approach is that the challenged instruction dealt solely with the issue of liability which was resolved by the jury in favor of appellant. Having received a favorable verdict on that issue, errors which relate to the trial and submission of the liability issue become, insofar as plaintiff is concerned, harmless error.

*Id.* Alack has not sufficiently demonstrated that the erroneous liability instruction actually influenced or prejudiced the jury's damage award. While Alack argues that the impact of the erroneous admission of evidence and instruction on the jury is "obvious", such a connection is too speculative. It must be presumed that the jury followed the court's instructions on damages. *Id.* The trial court did not err in refusing to grant Alack a new trial on damages only.

### III. Punitive Damages

■ Finally, Alack alleges that the trial court erred in refusing to submit a punitive damages instruction to the jury. In a negligence case, punitive damages are awardable only if, at the time of the negligent act, the defendant "knew or had reason to know that there was a *high degree of probability* that the action would *result in injury.*" *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* 700 S.W.2d 426, 436 (Mo. banc 1985) (emphasis in original); *see also Stojkovic v. Weller,* 802 S.W.2d 152, 155 (Mo.

---

4. This case does not involve an agreement negotiated at arms length between equally sophisticated commercial entities. Less precise language may be effective in such situations, and we reserve any such issues.

banc 1991); *Sharp v. Robberson,* 495 S.W.2d 394, 398 (Mo. banc 1973); and *Nichols v. Bresnahan,* 212 S.W.2d 570, 573 (Mo.1948). Punitive damages cannot be collected unless the defendant "showed complete indifference to or conscious disregard for the safety of others." *Stojkovic,* 802 S.W.2d at 155. We have described "conscious disregard or complete indifference" as:

> an act or omission, though properly characterized as negligent, [that] manifest[s] such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted. *Or there may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, [though] having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.*

*Hoover's Dairy, Inc.,* 700 S.W.2d at 435 (*quoting Sharp,* 495 S.W.2d at 397) (emphasis in *Sharp* ) (citations omitted).

In *Kansas City v. Keene Corp.,* 855 S.W.2d 360 (Mo. banc 1993), we further discussed the type of knowledge or evil intent that must be established in connection with a claim of conscious disregard or complete indifference for an award of punitive damages. A vague and generalized knowledge of danger is insufficient. The evidence must show that, at the time of the act complained of, the defendant had knowledge of a high degree of probability of injury to a specific class of persons. *Id.* at 375.

The instruction submitted by plaintiff, however, failed to include this necessary element of knowledge. The instruction was patterned on MAI 10.02. The notes on use to MAI 10.02, relying on this Court's decision in *Menaugh v. Resler Optometry, Inc.,* 799 S.W.2d 71, 74 (Mo. banc 1990), state that 10.02 is not to be used when the verdict directing instruction does not contain a submission on the issue of the defendant's knowledge. In this case, neither the verdict director, based on MAI 17.02, nor the proposed punitive damage instruction would have required the necessary finding by the jury of Vic Tanny's knowledge. As clearly noted, MAI 10.07 should have been submitted instead. The trial court properly refused Alack's punitive damages instruction.

## IV.

The judgment of the trial court is affirmed.

HOLSTEIN, C.J., and BENTON and WHITE, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

ROBERTSON, J., dissents in separate opinion filed.

COVINGTON, J., concurs in opinion of ROBERTSON, J.

LIMBAUGH, Justice, dissenting.

I respectfully dissent, but write separately from Judge Robertson, to express a partially different rationale. The contractual release of liability, as Judge Robertson so convincingly explains, is simply not ambiguous. It is comprehensive and all-inclusive. I suspect that similar provisions in the cases cited by the majority were deemed to be ambiguous in order to avoid harsh results.

Whether the contract is ambiguous, however, should not be the end of the inquiry, at least in the context of consumer sales contracts such as the one involved here. In my view, a release of liability for one's own negligence is so abhorrent to public policy that it should be disallowed unless it is not only clear, but also prominent and conspicuous. In fact, several jurisdictions have taken the extreme step of disallowing these release provisions altogether. *See e.g., Eder v. Lake Geneva Raceway, Inc.,* 187 Wis.2d 596, 523 N.W.2d 429 (1994); *Roll v. Keller,* 336 N.W.2d 648 (N.D.1983); *Fedor v. Mauwehu Council, Boy Scouts of America, Inc.,* 21 Conn.Sup. 38, 143 A.2d 466 (1958); *Walker v. Self Serv. Storage & Miniwarehouses, Inc.,* 492 So.2d 210 (La.App.1986); *Miller v. Fallon County,* 222 Mont. 214, 721 P.2d 342 (1986) (by legislation). I would be tempted to follow the lead were it not for my deference to the notion of freedom of contract and

my recognition of the possibility that the rewards of the contract might somehow exceed the risk of injury at the hands of the party to whom the release was given.

Although the majority states as I do that a release must be both clear and conspicuous, its holding depends solely on the conclusion that the language was ambiguous. To the contrary, the defect in the release was not that it was ambiguous, but rather that it was not conspicuous. The clarity of the words used hardly matters if the words go unnoticed.

The contract was lengthy, containing sixteen single-spaced paragraphs couched in print half the size of that used in the typical telephone directory. Furthermore, the release was not denominated as such, nor was it highlighted or set off from the other provisions. It was noticeable only by a close and thorough reading of the entire document, a rather daunting task for the simple privilege of joining a health club. When presented with a contract like this, even the most sophisticated of us are more properly counted among the hapless or unwary. With spectacles, see Exhibit A, a copy of the contract, attached hereto.

Had plaintiff merely signed the contract, I might have held it unenforceable, excusing him for the assumption that the contract would not contain such an extreme and unreasonable provision. Alas, plaintiff went to the trouble of a close and thorough reading, came across the release in question, and somehow determined that the words meant something different than what they stated. Despite the fact that the provision was not conspicuous, the plaintiff read it anyway. Under these circumstances, the plaintiff cannot claim to be misled.

Accordingly, I would reverse the judgment of the trial court and enter judgment in favor of defendant.

## RETAIL INSTALLMENT CONTRACT
### Vic Tanny International of Missouri, Inc.

**NOTICE TO THE BUYER**
1. Do not sign this agreement before you read it or if it contains any blank spaces.
2. You are entitled to an exact copy of the agreement you sign.
3. Under the law you have the right, among others, to pay in advance the full amount due and to obtain under certain conditions a partial refund of the finance charge based on the rule of 78's, less an acquisition charge of $12.00.

AGREEMENT, made this _15_ day of _July_ 19_52_, by and between the undersigned Seller,

Vic Tanny International of Missouri, Inc. at _____

and _____
(herein called Buyer, jointly and severally, if more than one)

A. ENROLLMENT: Seller agrees to, and does hereby, sell and Buyer agrees to, on the terms and conditions hereinafter set forth (including the terms and conditions contained on the reverse side hereof), a

membership in Seller's gymnasium for _____

(herein called, whether one or more, Member) under the _____ Plan which shall entitle said Member to the use of all of the facilities of the Seller available for such Plan subject to paragraph "L" at any and all times that such facilities are regularly made available for persons of Member's sex during the term hereafter described:

B. BASIC TERM AND FEE: The Basic Term of said membership shall be for a period of _ONE_ (1) years commencing with the date of this agreement. The fee consists of an initiation fee of $_____ and annual dues of $_____. Buyer agrees in consideration of seller's expenditure within 30 days of the date hereof of substantially all of seller's cost of enrolling and servicing member during the initial term hereof, that the initiation fee is due and owing to the seller upon execution of this agreement. The initiation fee and first year dues shall be paid as follows.

### DISCLOSURE STATEMENT

| SCHEDULE OF PAYMENTS | | PAYMENT OF TIME BALANCE |
|---|---|---|
| 1. Cash Price | $ 657 | "THE "TOTAL OF PAYMENTS" shown herein is payable in ___. Installments commencing on ___ 19__ and on the same date of each month thereafter until fully paid; each installment shall be in the sum of ___ with the final installment in the sum of ___. Buyer shall pay installments of the time balances (total of payments), together with any and all such other sums as are herein agreed to be paid, to Seller at its address, or to any assignee of the Contract as such address as Buyer shall be notified in writing. The finance charge applies from the date of this agreement. |
| 2. Less: Cash Down Payment | $ 45 | |
| 3. Unpaid Balance of Cash Price | $ 612 | |
| 4. Amount Financed | $ 612 | |
| 5. Finance Charge | $ ___ | |
| 6. Total of Payments (item 4 + 5) | $ 615 | For each installment which shall be indefault for at least 10 days, Buyer agrees to and shall also pay, not later than one month after such default, a delinquency charge of 5%, whichever is less, but in event buyer is resident of Missouri, not less than $1.00. In the event this obligation is referred to an attorney for collection, Buyer shall pay a further amount equal to 15% of the amount due hereunder for attorney's fees. If the Buyer fails to pay any installment within thirty (30) days after the date when such installment was due, then the remaining balance of installments shall, at the option of the holder, become immediately due and payable without further notice. |
| 7. Deferred Payment Price (item 1 + 5) | $ 700 | |
| 8. Annual Percentage Rate | 18.5 | |

Seller expects to assign this agreement to First Acceptance Co., whose address is 3101 N. Woodward, Suite 204, Royal Oak, Michigan 48072, as security for a loan from that company to seller.

C. RENEWAL OPTION: So long as member(s) is in good standing, the member(s) may, within 30 days of the basic term or any renewal term, renew this membership monthly be paying dues of $_____ per person per month. Failure to pay monthly dues will result in termination of this membership(s). Monthly dues payments must be made in consecutive order. NO LAPSE IN MONTHLY DUES PAYMENTS WILL BE PERMITTED. Payments may be made up to 12 months in advance. This renewal option is applicable only with respect to gymnasiums which are owned by seller and are in existence at the time of the option. *Subject to the Cost of Living Clause as contained in paragraph "P".

D. MEMBERSHIP INFORMATION: Any questions regarding your contract please call Member Relations Dept. (314) 576-5355 Buyer acknowledges receipt of a fully completed copy of this contract executed by both Seller and Buyer. Co-signer, if any, acknowledges receipt of completed copies of this contract and of co-signer statement.
IN WITNESS WHEREOF, the parties have hereunto set their respective hands, as of the date first above written.

Vic Tanny International of Missouri, Inc. **RETAIL INSTALLMENT CONTRACT**

By _____ Buyer (Sign Here) _____

CREDIT INFORMATION

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of sex or marital status. The Federal Agency which administers compliance with this law concerning the Health Club is the Federal Trade Commission at Washington, D.C. 20580.

| LAST NAME (print) | FIRST | INITIAL | DATE OF BIRTH | SEX | AGE | HOME PHONE | | |
|---|---|---|---|---|---|---|---|---|
| HOME ADDRESS | | CITY | | | | STATE | ZIP | HOW LONG |
| SOCIAL SECURITY NO. | DRIVERS LICENSE NO. | | | STATE | VERIFIED age address signature | | BY (INT.) | |
| LANDLORD OR MORTAGE CO. | ADDRESS | | | PREVIOUS ADDRESS | | | | |
| EMPLOYED BY | ADDRESS | | JOB TITLE | TIME ON JOB SALARY | | PHONE AND EXTENSION | | |
| PERSONAL BANK ACCOUNT | | BRANCH ADDRESS | | CITY | | ACCOUNT NO. | | |
| CREDIT REFERENCE (Open Account Only) | | ADDRESS | | CITY | | | | |
| NEAREST RELATIVE | | ADDRESS | CITY | | STATE | PHONE | | |
| NEAREST RELATIVE (not living with buyer) | | ADDRESS | CITY | | STATE | PHONE | | |
| PERSONAL REFERENCE (not living with buyer) | | ADDRESS | CITY | | STATE | PHONE | | |

IF LENGTH OF EMPLOYMENT OR INCOME INADEQUATE THE FOLLOWING ADDITIONAL INFORMATION SHOULD BE OBTAINED BEFORE EXTENDING CREDIT.

| OTHER SOURCE OF INCOME | AMOUNT | NAME OF PROVIDER | |
|---|---|---|---|
| PROVIDER EMPLOYED BY | TIME ON JOB | PHONE | DEFENDANT'S EXHIBIT D |
| ADDRESS OF EMPLOYMENT | CITY | STATE | |

Verified_____ By_____ Date_____

E  It is expressly understood by and between the parties hereto and the Buyer acknowledges notice of an intended sale or assignment of this Agreement by Seller and that the rights and benefits of Seller under this Agreement will inure to the benefit of Seller's assignee   NOTICE: Any holder of this Consumer Credit Contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

F  It is expressly understood and agreed that this contract IS NOT assignable or transferable by the Member or Buyer and no rights or privileges granted by this Membership can be transferred or assigned by the Member or Buyer

G  By the use of the facilities of Seller and/or by the attendance at any of the gymnasiums owned by Seller, the Member expressly agrees that Seller shall not be liable for any damages arising from personal injuries sustained by the Member or his guest in  on or about the premises of the said gymnasiums or as a result of their using the facilities and the equipment therein. By the execution of this agreement Member assumes full responsibility of any such injuries or damages which may occur to the Member or guest in  on or about the said gymnasiums and further agrees that Seller shall not be liable for any loss or theft of personal property  Member assumes full responsibility for any injuries damages or losses which may occur to Member or guest, in, on or about the premises of said gymnasiums and does hereby fully and forever release and discharge Seller and all associated gymnasiums, their owners, employees and agents from any and all claims, demands, damages, rights of action, or causes of action, present or future, whether the same be known or unknown  anticipated, or unanticipated, resulting from or arising out of the Member's or his guests use or intended use of the said gymnasium or the facilities and equipment thereof.

H. Buyer and Member warrant, represent and agree that Member is in good physical condition and that he has no disability, impairment or ailment preventing him from engaging in active or passive exercise or that will be detrimental or inimical to his health, safety, comfort, or physical condition if he does so engage or participate

I.  Buyer shall not be relieved of his obligations to make any payment herein agreed to, and no deduction or allowance from any of said payments shall be made, by reason of the absence or withdrawal of Member from the gymnasium, or by reason of Member's failure to attend or use the gymnasium

J  If during the term of this contract, Member shall die or become substantially physically disabled, whereby member shall have been unable to receive all services Buyer contracted for Buyer and/or his estate shall be relieved from making payments for services other than those received or allocable prior to death and/or the onset of substantial physical disability

All sums prepaid for services to be rendered shall, on request, entitle Buyer and/or his representative to an immediate refund of so much of the sum prepaid as is allocable to services member has not received.

Whenever this membership contract is payable in installments and the Buyer is entitled to be relieved from making further payments or is entitled to a refund under this clause, the amount of the contract price allocable to services not received shall be the proportion of the total contract price as the sum of the periodic monthly balances not yet due bears to the sum of all the periodic balances under the Schedule of installments in the contract.

A buyer or Member claiming benefits under this paragraph shall supply Seller's consulting physician with satisfactory written evidence of substantial physical disability

K. Member agrees to keep and obey all rules and regulations now in force or in the future prescribed by Seller  or if associated gymnasiums, for the use of gymnasium and the equipment and facilities therein, and Seller reserves the right to revoke this membership for cause if Member fails to keep and obey any of such rules and regulations, or for reasons of nuisance, disturbance or other members, moral turpitude or fraud.

L. Seller operates and agrees to maintain gymnasiums as to hours, location and facilities substantially as at the date hereof subject to Seller's right and privilege at any time hereafter to close, alter or relocate any of its facilities and to change the time when such are open  The privileges and rights granted to a Member herein to use the facilities and equipment of Seller shall not be understood to mean that Seller guarantees any particular location or to maintain all of its existing facilities and gymnasiums

M. This contract shall be interpreted in accordance with the Statutes of the State in which executed and if any particular provision of this contract shall be deemed invalid the same shall not affect the balance of his contract and the remaining provisions thereof

N.  You have the right as a buyer to cancel this contract by sending written notice of your intent to cancel to the company at its main office at 12703 Dorsett Road, Maryland Heights, MO. 63043. Attention Hazel Green  To be effective, your notice must be postmarked or delivered in person by midnight of the third day following the date on your membership contract and must be accompanied by all documents delivered to you by the company at the time the contract was signed

O.  A three dollar ($3 00) charge will be imposed to replace a lost membership card.

P.  The annual renewal dues may be increased at the beginning of any renewal year in the same proportion as the United States Department of Labor Consumer Price Index. All Items (1967 equals 100) shall have increased from the date when this Agreement was signed to the date of the commencement of the applicable renewal year  This renewal option is applicable only with respect to gymnasiums which are owned by Seller and are in existence at the time of exercise of the option

### ASSIGNMENT AND SELLER'S WARRANTIES

The undersigned hereby sells, assigns and transfers to
it successors or assigns, the within Membership Contract subject to the following warranties  (a) that said contract was personally executed by the person or persons named therein as Buyer and is binding upon Buyer for the full amount of the Contract balance which is correctly set forth therein; (b) that the down payment set forth in said Contract has actually been received by Seller in cash from the Buyer on or before the date of the said Contract; (c) that the Buyer has no defense, setoffs, or counter claims in connection with the unpaid balance of said Contract; (d) that the undersigned is the owner of said Contract and that it has not previously assigned or encumbered said Contract. The undersigned agrees that in the event any of the foregoing warranties are untrue, the undersigned unconditionally guarantees the full performances of said Contract by the Buyer.

Vic Tanny International of Missouri, Inc

By _____

---

ROBERTSON, Justice, dissenting.

I respectfully dissent.

Were this a case of first impression, I believe there are strong, perhaps even compelling, arguments to conclude that public policy ought not to allow persons to absolve themselves contractually from liability for their own future negligence. The Court today affirms that Missouri law recognizes freedom of contract and, therefore, the freedom of parties to agree that one or both parties will not be liable to the other for acts of future negligence. Given the long line of authority supporting that notion generally, I agree with the premise from which the majority begins.

If contracts permitting persons to absolve themselves of future liability in negligence are permitted, it seems to me that the only issue left for the Court is one of contract: whether the language of the contract between Vic Tanny and Charles Alack absolves

Vic Tanny from liability for its future negligence resulting in injury to Charles Alack. As the majority notes, Alack does not claim that he did not see the exculpatory language in the contract when he entered it, only that he believed the language applied solely to his own negligence. Alack's understanding of the meaning of the contract is legally significant only if the contract itself is ambiguous. A contract is not rendered ambiguous because the parties disagree on its interpretation. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon,* 491 S.W.2d 261, 264 (Mo. banc 1973).

The relevant language in the contract between Vic Tanny and Charles Alack provides:

> By the use of the facilities of Seller [Vic Tanny], and/or by attendance at any of the gymnasiums owned by Seller, the Member [Charles Alack] expressly agrees that *Seller shall not be liable for any damages arising from personal injuries sustained by the Member* ... in, on, or about the premises of said gymnasiums or *as a result of ... using the facilities and the equipment therein.* By the execution of this agreement *Member assumes full responsibility of any such injuries or damages which may occur to Member ... Member assumes full responsibility for any injuries, damages or losses which may occur to Member* ... in on or about the premises of said gymnasiums *and does hereby fully and forever release and discharge Seller and all associated gymnasiums, their owners, employees and agents from any and all claims, demands, damages, rights of action, or causes of action, present or future whether the same be known or unknown, anticipated or unanticipated, resulting from or arising out of the Member's ... use or intended use of the said gymnasium of the facilities and equipment thereof.*

(Emphasis added.)

In construing contracts, courts must consider the parties' intent. Courts ascertain the intent of unambiguous contracts by giving the specific language used its "natural, ordinary, and common sense meaning" and by looking to the contract as a whole. *Wilshire Const. Co. v. Union Elec. Co.,* 463

S.W.2d 903, 906 (Mo.1971). Courts should also consider the "object, nature and purpose" of the contract. *Id.* Thus, the contract must be analyzed in its entirety to determine whether the contractual language is sufficiently clear to notify Alack that he could not sue Vic Tanny for injuries he might sustain due to Vic Tanny's future negligence. A contract is ambiguous if its language is susceptible to more than one meaning. *Sigma Alpha Epsilon,* 491 S.W.2d at 264. Said another way, ambiguity exists "where there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Rodriguez v. General Accident Ins. Co. of Am.,* 808 S.W.2d 379, 382 (Mo. banc 1991).

The contract plainly alerts Alack:

1. "Seller will not be liable for any damages arising from personal injuries...."

2. "Member assumes full responsibility of any such injuries or damage which may occur to the Member...."

3. "Member assumes full responsibility for any injuries ... which may occur to Member...."

4. "[Member] does hereby fully and forever release and discharge Seller ... from any and all claims, demands, damages, rights of action, present or future ... resulting from or arising out of the Member's ... use ... of said gymnasium or the facilities and equipment thereof."

The majority concedes that "[i]n a theoretical vacuum the words 'any and all' might appear unambiguous." (Op. at 337). What does this mean? It can mean one of two things. First, it can mean that the contractual language is patently ambiguous and in need of interpretation. Second, it can mean that there is a latent ambiguity in the contract in need of construction.

Authoritative commentators, including those cited by the majority, draw a distinction between interpretation and construction of contracts. Interpretation "is the process of applying the ordinary legal standard to the words ... used in order to determine their meaning...." 4 *Williston on Contracts,* § 602 (3d ed.). The "ordinary legal standard" means that courts give words "their ordinary meaning." *Id.* The ordinary meaning of words is found in the dictionary.

On the other hand, construction of a contract permits courts to give special meaning

to language "other than the normal meaning of the words." *Id.* Construction is permitted "only when the primary standard of interpretation leaves the meaning of the contract ambiguous." *Id.* Courts of this state (with the exception of this Court in this case) have generally recognized this distinction. "A court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language for there is nothing to construe." *Sigma Alpha Epsilon,* 491 S.W.2d at 264. "When the language of a contract is plain, there can be no construction by the court because there is nothing to construe." *Grantham v. Rockhurst Univ.,* 563 S.W.2d 147, 150 (Mo.App.1978); *Sigma Alpha Epsilon,* 491 S.W.2d at 264.

There is no need for interpretation in this case. The language used in the contract is unambiguous. It could not be any more clear, intelligible or unmistakable. "All" means "[e]very." Webster's Third New International Dictionary 54 (1976). A "claim" is "[a] cause of action." Black's Law Dictionary 247 (6th ed. 1990). A "right of action" is "[t]he right to bring suit." *Id.* at 1325. Surely the words "all claims" and "all rights of action" include claims for negligence. Moreover, the cases of this Court have consistently read "all" to mean "every" in similar contexts. In *St. Louis & Suburban Ry. Co. v. Stewart,* 187 S.W. 836 (Mo.1916), a contractor brought suit against a contractee seeking indemnification for damages paid a subcontractor's employee for injuries caused by the contractee's negligence. The contract provision stated: "The contractor shall assume all risk of accident to ... workmen or persons engaged in or about the building...." *Id.* at 837. This Court held that the phrase "all risk of accident" absolved the contractee for liability resulting from the contractee's own negligence.

In *Terminal Ry. Ass'n. of St. Louis v. Ralston–Purina Co.,* 352 Mo. 1013, 180 S.W.2d 693 (1944), a widow filed suit against a railroad company under the Federal Employers' Liability Act following her husband's death. The husband met his demise when he was crushed between a box car and a structure that Ralston–Purina built closer to the track than an agreement between the rail-

road and Ralston–Purina permitted. After settling the widow's suit, the railroad company sued Ralston–Purina, seeking indemnification. The contract between Ralston–Purina and the railroad company provided, among other things, that: "The Industry [Ralston–Purina] shall save and hold harmless the Railroad from all loss, damage, injury or death caused by obstructions being closer to the Industrial track than specified herein." *Id.* 180 S.W.2d at 694. The railroad conceded that its negligence contributed to the husband's death. Nevertheless, this Court held that the language "[a]ll loss, damage, injury or death" in the contract "is susceptible of only one reasonable construction" and held for the railroad company. *Id.* 180 S.W.2d at 697.

The majority ignores *Stewart* and *Ralston–Purina,* preferring *Poslosky v. Firestone Tire and Rubber Co.,* 349 S.W.2d 847 (Mo.1961). But *Poslosky* offers little aid. That case announces the rule that "a contract provision exempting one from liability for his or her negligence ... must be clearly and explicitly stated." *Id.* at 850. As the majority concedes, this Court's decision in *Poslosky* turns on the *absence* of clear language releasing Firestone for liability for its own negligence. However, nothing in *Poslosky* equates the clear and explicit statement of an exemption from liability with the use of the word "negligence" or "fault." Nor is there any language in *Poslosky* that supports the notion that "all" means less than "every." Thus, *Poslosky* stands only for the proposition that ambiguous language will not relieve a party of liability for future negligence—a proposition with which no one argues. *Poslosky,* however, implies just the opposite, that clear and explicit contractual language is effective to exonerate a party from liability for future negligence even if the word "negligence" is not employed for that purpose.[1]

Since there is no patent ambiguity in the language used in the contract, and no basis for interpretation, the majority must mean that the contract contains a latent ambiguity and invites itself to begin construction of the language. There is a latent ambiguity, the

---

1. *Phoenix Assur. Co. of N.Y. v. Royale Inv. Co.,* 393 S.W.2d 43 (Mo.App.1965), holds that the phrase "[t]he Hotel assumes no responsibility" is too ambiguous, too cryptic, to absolve a bailee of liability for its negligence. This seems obvious. *Meyer Jewelry Co. v. Professional Bldg. Co.,* 307

majority imagines, for two reasons. First, the majority says the contract is ambiguous "because it did not state that a member was releasing Vic Tanny for its future negligence." (Op. at 337). Second, the majority claims the contract is ambiguous because "one may never exonerate oneself from future liability for intentional torts or for gross negligence...." (Op. at 337).

The first "latent ambiguity" is a restatement of the rationale in *Hornbeck v. All Am. Indoor Sports, Inc.*, 898 S.W.2d 717 (Mo.App. 1995). *Hornbeck* found an exculpatory clause relieving All American from "any and all claims" ineffective. *Hornbeck* "reasoned" that general language which clearly and explicitly absolves a party from its own negligence must be "specific" so as to avoid ambiguity. Stated another way, *Hornbeck* says that all-inclusive language is too broad to be effective. One would hope that the majority is unwilling to apply this rationale across the legal board. If it did, the Fourteenth Amendment's application to "all persons" might be ineffective without a more specific list of the persons to whom "all" refers. And if "all" means "every" only some but not all of the time, how does anyone know when "all" means "every" and when it means something less?

There is simply no latent ambiguity in the all-inclusive language in this contract.

Second, a latent ambiguity arises where some collateral fact renders the meaning of the language uncertain. *Royal Banks of Missouri v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc 1991); 4 *Williston on Contracts*, § 627 (3d ed.). Where a latent ambiguity justifies a court's decision to begin constructing, the ambiguity must arise under the facts applicable to the contract *sub judice*. The fact that a party (or in this case the Court) might conjure up an ambiguity that would exist in some other circumstance does not render the contract ambiguous in every circumstance.

The majority is not talking about an ambiguity at all. The general rule of law that courts will properly refuse to give effect to exculpatory clauses for intentional torts is not a rule governing interpretation and construction. It is part of the substantive law of contracts. "[A] rule of law which forbids effect being given to that [clear] meaning is part of the substantive law of contracts which comes into play after interpretation and construction have finished their work." 4 *Williston on Contracts*, § 602 (3d ed.). Thus, courts refuse to enforce such exculpatory clauses not on the basis of ambiguity and not as a matter of contractual interpretation or construction, but as a matter of public policy. The clear language of the contract, if enforced, exonerates the tortfeasor. There would be no point in declaring such an exculpatory clause contrary to public policy if it were merely ambiguous and could be construed away. It is the clarity of the language that causes the court to resort to public policy as a justification for its holding. The court simply refuses to honor the effect of the clear language.

S.W.2d 517 (Mo.App.1957), involved an exculpatory clause that read:

> The Lessor ... shall not be liable for any damage done to property or any person in said building at any time ... or from any damages arising from the acts or negligence of co-tenants or other occupants of the same building, or any of owners or occupants of adjacent or contiguous property.

*Id.* at 520. The contractual provision expressly spoke only to the negligence of co-tenants, other occupants, or owners or occupants of adjacent property. Consequently, the court of appeals held the language of the lease did not "in plain terms exonerate the appellant-landlord from its own acts of negligence." *Id.* at 521. The court reasoned that the law's strict construction of exculpatory clauses proceeded from the belief that in the absence of clear and explicit language, "the minds of both parties probably never intended such absolution." *Id.* at 521. It was not, however, the failure of the exculpatory clause to use the word "negligence" that justified the holding in *Meyer Jewelry*. Rather, the ambiguous language of the contract—language that included the word "negligence"—led to the court's decision. *Thomas v. Skelly Oil Co.*, 344 S.W.2d 320 (Mo.App.1960), relies on *Meyer Jewelry* and *Ralston-Purina*. Thus, *Thomas* properly focuses on the specific language of the exculpatory clause to determine its effect, *id.* at 321–22, not on the presence of the word "negligence." Carefully read, *Thomas* does not dispute that the word "all" is sufficient if the language of the clause is otherwise clear and explicit.

The majority also cites to *Vergano v. Facility Management of Missouri, Inc.*, 895 S.W.2d 126 (Mo.App.1995). *Vergano* stands only for the proposition that a contract that contains language plainly indicating that a party intends to exonerate itself from liability for its own future negligence is effective.

There is no latent ambiguity created in this contract by the refusal of the substantive law to recognize exculpatory clauses purporting to relieve a party of liability for intentional torts.

Judge Limbaugh correctly understands the majority's jurisprudential standard in this case when he says that the majority invents an ambiguity where none exists "in order to avoid harsh results." The judicial viscera is no substitute for the application of time-honored principles on which courts ought to found their decisions.

The public policy of Missouri permits parties to agree contractually to relieve one or both of them from liability for future negligence. That the contractual language under scrutiny might not exonerate Vic Tanny from willful torts does not create an ambiguity where the issue is whether the contractual language shields Vic Tanny from liability for its negligent acts. As to the issue before the Court in this case, the language of the contract is clear—whether one considers it in a theoretical vacuum or in the practical application of the facts to this case.